LEWIS FORD DENISON v. STATE OF NEBRASKA.

FILED NOVEMBER 10, 1928. No. 26375.

*H. M. Sullivan, Ed. P. McDermott,* and *Pratt, Hamer & Tye,* for plaintiff in error.

*O. S. Spillman, Attorney General, George W. Ayres* and *E. G. Reed, contra.*

Heard before Goss, C. J., Rose, Dean, Good, Thompson, Eberly and Howell, JJ., and Redick, District Judge.

Redick, District Judge.

The defendant, Lewis Ford Denison, was charged in the information with the crime of murder in the first degree; he was convicted of manslaughter and sentenced to the penitentiary for a term of seven years, and prosecutes error to this court.

The occasion and circumstances of the tragedy are, to say the least, unusual, and will be briefly stated as furnishing a background for the discussion which follows. The place of the homicide was on a public road near the farm house of one Gabriel Shada, a brother of John Shada, the victim thereof. The Shadas were Syrians, who will be so designated to distinguish them from the crowd of Kearney boys and young men later referred to. On the morning of August 28, 1927, a large number of Syrians had assembled at St. George's Church at Kearney, Nebraska, attending divine service, at which time a baby of John Shada, deceased, was to be baptized. It seems to be a custom among Syrians to celebrate such an occasion by a gathering of the friends and relatives of the father for social

and friendly intercourse, and they were present in large numbers, some from Michigan and some from Iowa, and from different points in the state of Nebraska. The day was also the birthday of John Shada, deceased. At the church, notice was given that all present were invited to the farm of Gabriel Shada, about six and one-half miles east of Kearney, to celebrate the occasion, and in the early afternoon were gathered at the farm some 125 or 150 people, nearly all Syrians; dinner was served and various games were played, the whole affair being in the nature of a large picnic. Among them were John, Gabriel and Charles Shada, with their wives, families and a large number of others who were called as witnesses. John lived at Lexington near Kearney, Charles at Kearney, and Gabriel at his farm.

During the middle of the afternoon, between 3 and 4 o'clock, a crowd of 8 to 10 young men and boys from Kearney came out to Gabriel Shada's farm, apparently for the purpose of "baiting" the Syrians. At any rate there ensued a fight in which the Kearney boys were defeated and returned to town leaving one of their number, Ernest Noble, at the farm, an incident to which reference will be made later. The defendant was not present at this occurrence. Upon the return of the crowd to Kearney a large crowd, variously estimated from 50 to 75 in number of young men and youths was assembled, and headed by a truck in which 8 to 10 were loaded, and followed by about 15 automobiles carrying the others, started for the Shada farm, arriving about 500 or 600 feet west of the gate thereof between 5 and 5:30 p. m., where the cavalcade stopped in a line upon the south side of the traveled road. Before reaching this last destination, and perhaps an eighth or a quarter of a mile west thereof, three automobiles loaded with Syrians returning home were met by the crowd; the the cavalcade was stopped, and many of the men got out upon the road three different times and stopped the automobiles coming west, in each case calling the occupants dagoes and opprobrious names, and, in at least two in-

stances, striking and abusing occupants of the cars; the cars containing men, women and children. None of them were seriously injured and they were shortly permitted to proceed on their way.

When the Kearney cars were stopped at the point above indicated, practically all of the occupants got out and began gathering sticks and clubs and other similar weapons and advanced toward the Shada farm in an uneven line stretching across the road. The approach of the cars from Kearney was noticed by a number of children playing in the road and they ran into the farm, giving the alarm that a big crowd was coming. Thereupon Gabriel Shada, who testified that he told all the others to stay back, walked out onto the road and approached the crowd from Kearney with one or both hands lifted up, and when within 15 or 20 feet of them, as he testifies, he said to them, "Boys, what are you doing here? I don't want no trouble," and thereupon one or more of the Kearney boys jumped at Gabriel and struck him a severe blow on the side of the face, and he turned around toward his own people. John, the deceased, followed Gabriel out onto the road at a short distance, about 15 feet, and a little to the left of Gabriel, facing south and apparently going across the road toward a crowd of Kearneyites assembled on the south side of the road and a little west of John. While John was in that position, facing south, and almost immediately after Gabriel had been struck, a shot was fired from the west, the bullet entering John's neck below the ear and about an inch or an inch and a half back of the angle of the jaw-bone. John put his hand to his face, turned to the right, and started back toward his friends, who by this time had gathered in some numbers in the road. He was taken by his wife and friends to an automobile and thence to Kearney to a hospital, where he died that night as the result of the wound.

Prior to the firing of the shot there had been a number of minor fracases, during which at least two of the Syrians had been struck with clubs, one of them being knocked into the ditch by the side of the road, and there was consider-

able yelling and holloing on the part of the Kearneyites. There was some evidence by the witnesses for the state that two, two or three, or three or four shots were fired, coming from the west, but, if so, only one caused any damage. Some of the defendant's witnesses testified that two or three shots came from the east, and some of them identified Sam Shada as the party who fired them, but all of those witnesses who positively identified Sam Shada testified that he fired in the air and that no one was hurt. The evidence warrants the inference, if more than one shot was fired, that there was a slight pause between the shot which killed John and later ones. At any rate the evidence and circumstances point overwhelmingly to the conclusion that the fatal bullet came from the west or from the north and west at a point occupied by the Kearneyites, and where the evidence shows without contradiction there were no Syrians. Immediately upon the firing of the shot or shots, the Kearney crowd turned and ran back to their cars, and the Syrians, men and women, came into the road in considerable numbers, and the trouble was over.

1. The vital question is: Who fired the shot that killed John Shada? The state did not charge and the case was not tried upon the theory that defendant was a member of a mob or riot during the occurrence of which Shada was killed, but directly charged the defendant with firing the fatal shot, and defendant's first assignment of error is that the evidence is insufficient to support the verdict. It will, therefore, be necessary to briefly review the evidence upon which the state relies, with which we now proceed.

Charles Shada, uncle of deceased, testifies that he saw Gabriel and John go out into the road, and that he followed them, walking down the north side of the traveled portion, westerly; that he was some 20 or 30 feet back of Gabriel, and saw him lift up his hands, but could not hear what he said; that he saw John walking across the road facing the south; that he had known defendant Denison about 20 years, since he was a baby, and had seen him a number of times that summer in Kearney, where witness lived; that

when he got within 15 or 20 feet of Gabriel he saw defendant to the north and a little west of John—"8, 15 or 10 feet from John"—with a revolver in his hand, pointed toward John's ear; that he immediately shouted, "Don't shoot, Denison, I know you;" that immediately thereafter he saw defendant fire the revolver, and that John was in the center of the road facing south when the shot was fired. The bullet entered the right side of the neck below the ear near the angle of the jaw-bone, and its course was a little to the right and upward. These facts corroborate the witness as to the location of the parties, completely demolishing the theory of the defense that John was shot by one of his own people.

Charles Shada is corroborated by his wife, Mary, who testified that she knew Denison, that he was not very far west from Charley, that she saw a little gun in his hand and saw him shoot, that John was in the road not far from Denison, looking south, and that she saw blood in John's mouth.

Reverend Yanney, pastor of St. George's church, heard a shot from the west and a little south from where he was standing in the yard by the road, heard three or four shots close together, but did not see any gun or who shot.

George Shada testified that he was struck and fell into the ditch on the north side of the road, and heard shots from the south and west of him. Nicholas Shada testified that he was going west on the north side of the road and heard Charley say, "Don't shoot, Denison, I know you"— heard three shots from the west close together—thought they were from the same gun—shots were fired just as Charley finished—saw George Shada in the ditch.

George Simon testified that he heard Charley call Denison by name and say, "Denison, I know you, don't shoot," but did not see Denison in the crowd; that just before John was shot he was facing south of west, mostly south.

Amen Shada, son of Gabriel, saw Gabriel going west down the road followed by John who was a little southwest of Gabriel, facing south, when he was hit; heard Gabriel

say, "Don't shoot," then heard two or three shots from the west, from the northwest of John.

Denison was identified by witnesses both for the state and defendant as wearing a leather jacket. Rosie Miller, testified that she was in the first car stopped by the Kearney crowd west of Gabriel Shada's place, and that a number of boys jumped onto the running-board of her car, among them one wearing a brown leather jacket, who had a pistol in his hand; she did not know defendant Denison at the time, but subsequently positively identified him as the boy with the leather jacket, picking him out from eight or ten young men who had been arrested and placed in the jail at Kearney. She is corroborated to some extent by her mother, who was with her in the car, as to the transaction on the road. There was considerable other testimony tending to corroborate the state's witnesses on various minor points. There was no direct effort to impeach any of the witnesses called for the state, but they were thoroughly cross-examined by able counsel and some inconsistencies between their evidence upon the trial and at other times were developed. The defendant introduced a large number of witnesses from the crowd that went out from Kearney who gave a description of the events as they saw them, but the only testimony tending to rebut the direct and positive evidence of the state was by several witnesses to the effect that they heard shots coming from the east; that, at the time the shot which killed John was fired, Denison was fighting or wrestling with some one in the ditch at the north side of the road. Two witnesses swore that Charles Shada made statements to the effect that one Nutter was the person who fired the fatal shot, and some contradictory statements of Charles were developed on cross-examination. The defendant himself did not take the witness-stand and we are therefore deprived of any possible benefit which we might have received from a statement of his version of the affair.

The bill of exceptions in this case covers more than 1,500 typewritten pages. It has been most carefully read and

studied with particular reference to this assignment of error, and we have reached the conclusion that the evidence given upon the part of the state, if believed by the jury, was amply sufficient to sustain the verdict. That evidence is practically without direct dispute as to the main facts necessary to sustain a conviction. Its weight and sufficiency and the proper inferences to be drawn from it were for the jury. If the evidence may be deemed conflicting upon the pivotal points in the case, nevertheless, where the evidence of the state, if believed by the jury, is sufficient to sustain the verdict, this court will not interfere. *Wheeler v. State,* 79 Neb. 491; *Denker v. State,* 106 Neb. 779; *Ingoldsby v. State,* 110 Neb. 495.

2. The second assignment of error is that the court erred in submitting to the jury the question of defendant's guilt of manslaughter. Section 10155, Comp. St. 1922, provides: "In all trials for murder the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter." But counsel for defendant correctly contends that this statute does not require the submission of a degree or grade of homicide which has no support in the evidence. The contention of defendant on this point is that the evidence introduced by the state in this case admits of only one of two conclusions, namely, that defendant was guilty of murder in the first degree, or murder in the second degree, and that, therefore, if the jury were not convinced beyond a reasonable doubt of his guilt of one of those offenses, he was entitled to an acquittal. The statutes of this state define manslaughter as follows: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter." Comp. St. 1922, sec. 9546.

Counsel insists that under no view of the evidence in this case would the jury be justified in finding either that the defendant shot John Shada upon a sudden quarrel, or un-

intentionally, while in the commission of an unlawful act. These alternatives will be discussed in their order.

(a) The evidence tends to establish that immediately prior to the shooting several conflicts between individuals of the opposing sides had taken place; that the defendant himself had struck one of the Syrians (identified as George Shada) with a club, knocking him into the ditch on the north side of the road, and with such force as to break the club in two, the portion of which remaining in his hand he then threw to the ground. Then some one on defendant's side struck Gabriel Shada a severe blow, from the effect of which he was dazed and unable to see. Then followed in quick succession the fatal shot. These occurrences took place in less time than it takes to record them—they were incidents of a fight then being carried on between the opposing parties. The jury might well be unwilling, under these circumstances, to find that the defendant acted with deliberate and premeditated malice and was therefore guilty of murder in the first degree; again, they might be unwilling to find that he acted with malice and therefore guilty of murder in the second degree. The state was required to prove malice in order to convict defendent of second degree murder. There is no presumption of malice in this case where all the circumstances of the killing are testified to by eye-witnesses. *Davis v. State,* 90 Neb. 361. To convict of murder in the second degree it is not sufficient merely to prove that the killing was intentional; it must also have been malicious. On the other hand, there is little, if any, question but that a verdict finding defendant guilty of either one of the higher crimes would be sustained by the evidence in this case. The verdict of the jury implies that defendant's act was neither premeditated nor malicious. They do find, however, that defendant killed John Shada, without justification or excuse, because none was offered. Defendant's counsel insists or implies from his argument that it was the duty of the court to analyze and weigh the testimony as to the manner in which the tragedy occurred and determine as a matter of

law that the defendant was not guilty of the crime of manslaughter, notwithstanding the fact that it was well established that under some circumstances the defendant fired the fatal shot. We think this would be placing too great a burden upon the court by requiring it to perform duties and determine facts from the evidence which the defendant had the right to have submitted to the jury. The jury are to say what facts are proved and what are the proper inferences to be drawn from those facts, and in view of the evidence and nature of the conflict at the time the shot was fired, they had a right to conclude, if so convinced by the evidence, that the defendant killed Shada upon a sudden quarrel.

(b) But defendant's main contention is that there was no evidence which would warrant the jury in convicting the defendant of involuntary manslaughter, that is, of shooting the deceased unintentionally while in the commission of an unlawful act. That the defendant was in the commission of an unlawful act at the time of the shooting is proved beyond question. The testimony of witnesses for the defendant is practically unanimous that the crowd was formed for the purpose of going out to the Shada farm, six miles distant, for the purpose of fighting and "licking" the Syrians. In pursuance of their unlawful intention they stopped on the highway three automobiles loaded with Syrians, assaulted and abused them; and within a short distance of the Shada farm stopped their cars, got out and began gathering sticks and weapons of all sorts for purposes of attack. That this was an unlawful assembly is beyond question. It was a mob and a riot in which the evidence seems to point to the defendant as a ring-leader. It needs no argument to show that at the time of the shooting the defendant was in the commission of an unlawful act within the meaning of those words as used in the statute defining manslaughter. But counsel insists that to convict under this alternative the killing must have been unintentional. Here again he seeks to put upon the trial court the burden of determining as a matter of law what

was the intention of defendant when he fired the shot while in the commission of an unlawful act. The intention with which an act is done is one of the most difficult questions of fact which is ever submitted to a court or jury. Neither can enter the mind of the actor and select from the innumerable thoughts and motives which control conduct the one which actuated him in doing a certain thing. So difficult is it to determine the intent that in many instances the law has declared presumptions thereof to aid in the discovery of the truth. In the final analysis the intention of a party must be discovered by the drawing of proper inferences from his conduct. This is the province of the jury, aided, in some cases, by legal presumptions. The evidence tends to prove that defendant pointed his gun at the deceased and fired. This is the testimony of Charles Shada who stood at one angle of a triangle formed by himself, John Shada, and defendant. He says he was about 20 feet east of defendant, who stood from 8 to 15 feet north and a little west of deceased who was standing about the center of the road, which would place him about 20 to 30 feet south and west of the witness. The witness was, therefore, to the side and at an angle from defendant, and though he attempted to do so, was in no position to determine the precise direction in which the revolver was pointed. Counsel in effect argues that the trial court should have accepted the statements of this witness as absolutely and mathematically true, and that, therefore, it is indisputably established that defendant intended to kill John Shada, and that permitting the jury to find an unintentional killing was an error. We cannot accept this proposition. It is not suggested that defendant knew John Shada or had any quarrel with him, nor is any other fact proved which would give rise to an inference that defendant intended to kill the deceased. The only inference is such as may properly arise from the fact that Shada was struck by the bullet from a gun pointed in his direction. We are not prepared to say as a matter of law that other inferences may not be drawn from the circumstances proved. Per-

haps he intended to shoot Gabriel Shada who was closest to him and had just spoken to him, but his aim was poor, or, upon losing the stick, his first weapon, he had pulled out his gun and fired promiscuously at the crowd. The tragedy occurred during a fight, within the space of a very few minutes when all was confusion and clamor. Under these circumstances to substitute the judgment of the court for that of the jury, as to the quality and characteristics of the acts of the parties, would deprive defendant of a substantial right. The inferences to be drawn from the facts and circumstances shown in the evidence are peculiarly within the province of the jury. We have not the slightest doubt that it was the duty of the court to submit to the jury the different degrees of homicide, and that, if he had not, the defendant would now be alleging error in this court for his failure so to do. Having concluded that no error was committed in submitting the question of manslaughter, it will not be necessary to discuss the question of the prejudicial character of such error had it been made.

3. The third assignment of error presents for consideration the exclusion of evidence of a statement of one of the Kearney boys about the time of the shooting. The witness by whom such statement was sought to be proved testified that immediately after the shots were fired some 12 or 15 Kearney boys came running west down the road and met the witness between 100 and 125 feet from the line of boys across the road, and that some boy made an outcry. Witness was then asked what he said: The state objected, and the objection was sustained, as not part of the *res gestæ* and hearsay. Defendant then offered to show by this witness that as the boys were running back some boy called out, "The Dagoes shot." Whether or not a declaration made by one of the participants in a transaction is a part of the *res gestæ* is dependent upon the circumstances of each case. The rule was stated in *Pledger v. Chicago, B. & Q. R. Co.*, 69 Neb., 456, as follows:

"A declaration to be competent evidence, as part of the *res gestæ*, must be made at such time, and under such cir-

cumstances, as to raise the presumption that it was the unpremeditated and spontaneous explanation of the matter about which made."

In the same case it is held: "The admission or exclusion of such evidence rests largely in the discretion of the trial court, such discretion is not an absolute discretion to be exercised arbitrarily, but a legal discretion, the abuse of which constitutes reversible error."

It may be conceded that the evidence offered comes within the rule above stated and its admission would not have been error of which the state could complain, but whether its rejection was reversible error as to the defendant depends upon several other matters now to be noticed. The *res gestæ* was the shooting of deceased by some person whose identity was sought. The spoken words are so indefinite that their meaning cannot be ascertained. They may have been intended to convey the information that "The Dago's shot" (the Dago is shot), or that "the Dagoes shot" (the Dagoes fired). The first is the most natural conclusion, as to convey the other meaning the cry would ordinarily have been "The Dagoes are firing," or "shooting." If the former, it referred to a fact about which there was no dispute; if the latter, it merely tended to corroborate the testimony of several of defendant's witnesses that the "Dagoes" fired two or three shots in the air. There is not the slightest basis in the evidence for a claim that John Shada was killed or hit by any of the shots fired from the east. This was physically impossible from the location of the wound and the undisputed evidence of the location of the parties when the shots were fired. The evidence is overwhelmingly convincing that John was in the road facing south and that the fatal shot came from the north and west striking him behind the right ear. All the evidence as to shots coming from the east place the point of firing back and to the left of John and on the south side of the road, and all but two witnesses testified that they were fired in the air or over the heads of the Kearney boys, and the two that the gun was held straight

out. No witness claims that these shots hit any one; some of them only saw the second and third shot fired. It is a fair inference from all the evidence that these shots, if they came from the east, were after a slight pause, and after the shot that killed John. Under these circumstances, and assuming that the evidence was within the *res gestæ* rule, we are unwilling to hold that the trial judge abused his discretion by rejecting the offer.

4. This assigns error in permitting witness Yanney to testify to statements made by Ernest Noble after the first fight in the afternoon. This evidence was brought out on redirect, in response to a suggestion of defendant's counsel on cross-examination that Noble had been kept captive by the Syrians. It seems Noble had been left behind when his comrades left for town after being defeated in the fight, and the statements were to the effect that he and his crowd had been in the wrong. He was allowed to clean up and one of Gabriel's boys took him back to town. The whole description of this first fight was probably immaterial, but the evidence objected to was called out to meet the suggestion that Noble had been kept a captive. We find no error in its reception.

(4) 7, 8, 9. These assignments relate to alleged error on account of remarks of the trial judge during the trial. The witnesses for the state were nearly all Syrians, some of whom did not appear to understand English very well, and there was some discussion as to the need of calling an interpreter. It would needlessly extend this opinion to quote all the questions and answers, but the remarks of the court to which objection is made are as follows: A witness, Mrs. Simon, having been asked by the court, "Do you understand?" answered, "I don't know." And the court said: "You have to understand before you answer." Again, the same witness was asked, "How close did they get to the car?" And the state's attorney said, "Now, you know she don't understand that." And the court: "Well, I tell you gentlemen, I will appoint somebody as interpreter here pretty quick. I am going to know wheth-

er this witness knows what she is testifying about." Mr. Hamer for defendant: "Well, I don't think there is an interpreter here from whom you can get what she—" The court: "Well, I think there are plenty of good honest men around here who will interpret it honestly." Mr. Hamer: "Well, I don't think so." The witness: "Mister, please—" The court: "Hold on. I will give you a chance, but I don't want her misled here." Mr. Hamer: "I don't want to mislead her. That is just what I am trying not to do. I don't want the court to get the idea that I am trying to mislead, nor that suggestion made here, for I am not." The court: "No, I don't think you are, but I am afraid we get her to answer things that she don't understand and then where are we? I am afraid she don't understand the language. Now, we will try it again and see." Later in the trial when Mary Shada was called as a witness, the county attorney said: "Judge, this lady doesn't understand English very well. We will do the best we can with her." The court: "If you want an interpreter, I will appoint one. It was very unsatisfactory with the other witness we examined here the other day. I am very much in doubt as to how much she understood about it." An interpreter was called and the court remarked: "You can go on here with your simple questions for a little while without the interpreter. Of course, counsel understand that, on cross-examination of a person who don't understand the language, you can get them all balled up and it is better to have an interpreter."

It is argued by defendant's counsel that the remarks of the court were "equivalent to saying that the contradictions between the testimony of the witness, Mrs. Simon, and her daughter, Mrs. Miller, could be accounted for on the theory that she hadn't understood the language." When this witness was first called the county attorney suggested that they would need an interpreter, but was instructed by the court to make his questions simple. A perusal of the examination of this witness convinces us that there was a real question as to the need of an interpreter. The

remark of the court was a part of the discussion of that question. We think it will not bear the construction put upon it by defendant's counsel.

Counsel contends that the remark of the court to the effect that an honest interpreter could be had was "a damaging indorsement of the Syrian witnesses," but we do not so consider it. The discussion regarded an interpreter. Probably a Syrian would have to be selected, but not necessarily so. At any rate, to characterize this remark as a comment upon the credibility of witnesses in the case would be giving it a significance not warranted by the words themselves nor the circumstances under which they were uttered.

The remark of the judge that he did not want the witness misled was evidently misunderstood by counsel, and perhaps might have been by the jury; but in his next utterance the judge said he did not believe counsel were trying to mislead her, thus correcting any erroneous impression the jury may have received.

It is suggested that certain statements of the court "show the desire of the court to keep the rude acts done by the boys constantly before the jury to the obscuring of the real issue in the case, or else to convey to the jury the thought that because of these acts the boys were unworthy of credit on the main issue." This proposition is absolutely without foundation in the record, upon a most painstaking examination of which we are unable to find any evidence of bias or partiality on the part of the court. Upon the record we are convinced that defendant had a fair trial. It has been suggested in argument that if any prejudice existed in the community it would be in favor of defendant belonging to a well and favorably known family as against the Syrians. We would be loath to recognize any such condition as would endanger the liberty of a citizen or punishment for crime, but in the present case its nonexistence is manifest by the verdict of the jury.

We have discussed all of the matters argued in the briefs as ground for reversal, and have considered all other as-

signments of error presented upon the oral argument, and have discovered no prejudicial error warranting our interference with the judgment.

AFFIRMED.