RICHARD W. BOURNE V. STATE OF NEBRASKA.

FILED OCTOBER 3, 1929. No. 26644.

*M. F. Harrington* and *George M. Harrington,* for plaintiff in error.

*C. A. Sorensen, Attorney General, Lloyd Jordan* and *W. A. Prince, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

GOSS, C. J.

This is the second review of this case. The defendant was convicted of murder in the second degree on his first trial. We reversed the judgment and remanded the case for a new trial. *Bourne v. State,* 116 Neb. 141. He was again convicted of murder in the second degree and again prosecutes error.

The information was filed in Sheridan county and the first trial was held there. On application of defendant a change of venue to Dawes county was allowed and the second trial took place in the latter county.

The brief on behalf of defendant does not comply fully with our rule requiring the errors discussed in the brief and relied on for reversal to be printed in the statement of the case. No formal assignment of errors appears there. The statement of the case leaves us to infer that the de-

fendant relies for reversal on the insufficiency of the evidence. This is supported by the fact that almost the entire brief of 81 pages is devoted to printed portions of the evidence. There is no specific claim in the brief that the court erred as to instructions given nor as to instructions refused. There is no direct assertion that the court erred in rulings on evidence, except perhaps as to insurance on the life of the deceased. The main contention of the defendant seems to be that the evidence was insufficient to support the verdict. We shall review the facts as if such assignment were duly made.

The information was drawn in the old-fashioned and involved way much in vogue prior to *Nichols v. State,* 109 Neb. 335. In that opinion a brief form of information for murder in the first degree was set out. Prosecutors will find it helpful to use it as a model.

The information in the instant case charged, in effect, that in Sheridan county, Nebraska, on October 8, 1925, the defendant, R. W. Bourne, feloniously, purposely, and of his deliberate and premeditated malice, shot Ferris C. Westervelt with a shotgun and as a result thereof Ferris C. Westervelt died on said day; and that the defendant thus committed murder in the first degree.

On the former appearance in this court, the cause was reversed chiefly on three grounds: First, that the evidence of motive, in relation to insurance on the life of deceased in favor of defendant, was insufficient, and the court should have given a requested instruction withdrawing such evidence from the jury's consideration; second, that the court erred in refusing and failing to instruct as to the manner of considering verbal statements or admissions attributed to the defendant by witnesses for the state; and, third, that the court erred in not instructing the jury as to the law inherent in the crime of manslaughter. There was, too, an intimation that the first trial of the defendant was not entirely surrounded by that atmosphere of fairness, undisturbed by prejudice, passion or ill will, due in such a case. If any confirmation, other than the lack of errors

assigned by the defendant, were needed, it may be said that, although not required to do so, we have read the entire record and find therein that both court and counsel appear to have conducted all phases of this trial with meticulous regard for the legal rights both of the defendant and of the people of the state of Nebraska.

The former opinion did not undertake to analyze the evidence to determine its sufficiency to support the judgment of guilt, but only as to its bearing on the errors there assigned. But it so happens that the opinion gives a general picture of the movements of the actors in this tragedy, the geography involved, and the detailed relations of many outstanding facts much as they appeared in the second trial. So, in the interests of whatever brevity we may achieve, we refer thereto for the general aspects of the case; and in this opinion we shall refer to the evidence as it appears in the present record in so far as it may apply to the points we take up for consideration and in so far as the present evidence is new or was not stated in the former opinion.

There is no doubt (1) that Ferris Westervelt's death was proved and that it resulted from gunshot wounds received on October 8, 1925; (2) that his death was either accidental or a homicide; (3) that it occurred between the time he and defendant were seen at Rushville and the time they were seen at the Westervelt home—a space of perhaps less than half an hour; and (4) that, no other eyewitnesses being produced, defendant's version of accidental death must be accepted, unless the circumstances shown in the evidence are such as to justify beyond a reasonable doubt in the minds of the jurors their finding that the defendant killed Ferris Westervelt.

Those circumstances are: (1) The state of the gun and manner and type of the gunshot wounds; (2) the condition of the body at the time the defendant first announced the shooting in relation to the time defendant claims the shooting occurred; (3) the acts of the defendant at and about the time of the announcement of the shooting; (4) the motive for the killing, if any, deducible (a) from defend-

ant's financial condition, (b) from the insurance features of the evidence, (c) from the chattel mortgage feature, and (d) from his connection with the probate of the estate of the deceased.

There were so many witnesses that we shall not undertake to review the evidence in the order of the above named circumstances nor to develop any one point fully before taking up another. They are too interwoven to make that treatment feasible.

Ferris Westervelt was born at Tilden, Nebraska, January 26, 1901, and died October 8, 1925. When he was examined for life insurance June 25, 1925, the medical examiner certified on his written report that he was exactly 5 feet, $10\frac{3}{8}$ inches tall and weighed (coat and vest off) 150 pounds. He was unmarried, worked out on farms as occasion offered, owned no lands or livestock and had no property except such as was for his personal use. He had a 16-guage, double-barreled L. C. Smith shotgun of the visible hammer type. When not working out he made his home with his parents, Mr. and Mrs. Jeffrey Westervelt, on a farm four and one-half miles north of Rushville. He had a younger brother and five younger sisters. Richard Wayne Bourne, the defendant, who is commonly called by his middle name, was about the same age as Ferris Westervelt. They were friends. Defendant lived at Gordon and was in the insurance and real estate business at Gordon, in the same county as Rushville. He was married to a cousin of Frank O'Rourk, and was a subagent under O'Rourk, who was general agent for the Old Line Insurance Company of Lincoln. O'Rourk had a desk in Wayne's office and transacted business there, where they used a safe in common.

The last time any of the Westervelt family saw Ferris alive was when Wayne called for him shortly before noon on October 7, 1925, and they started toward South Dakota in Wayne's Chevrolet roadster. They next saw him about 9 o'clock the night of October 8, dead, lying outside the gate in front of the house. This house fronts south, has six rooms with a porch extending along the front and to

some extent around on the east side. The house is located about 15 rods west of the north and south highway and is reached by a private driveway running west. There is a fence running east and west with a gate or opening directly south of the house and about 30 feet therefrom. The members of the family who were then at home had gone to bed about 8:30. The father and mother slept in the downstairs bedroom at the northeast corner of the house. Mr. Westervelt testified that it was their custom to sleep with their windows open except in bitter cold weather and this night was only chilly. He did not know whether their window was open or not, but the door between the bedroom and livingroom was open. Eunice Westervelt, then about 16, was sleeping in the northeast bedroom upstairs with her sister Myrtie, then about 9 years old. The east window of that bedroom was open. Verna was sleeping in the south bedroom upstairs with the window (on the east) open. The family were awakened about 9 o'clock at night by the defendant. Mr. and Mrs. Westervelt testified that they were aroused by the defendant, who opened the front door and called to them to come quickly, that Ferris was shot. Without dressing, the father ran out and found his son lying on his back on the ground with his head near the gate, his right arm down by his side, and his feet together reaching about to the right running-board of the car. The car faced west. Its lights were off. He testified that he did not think it was over half a minute, it was not over a minute, anyway, after Wayne called before he was there and touched his son's body; that he first felt of his right hand and then laid his hand on his son's face; that they were cold and clammy, and that he neither saw nor could feel any twitching of the eyelids or muscles of the face. He had Eunice and Wayne carry the body in and it was laid on the bed he and his wife had been using. When found, and while on the bed, Ferris was clothed as one would be when riding on a chilly night. He had on over his regular coat an unlined overcoat made of so-called reversible cloth of rather close weave. The blood from his wounds did not

pass through it to any great extent, as shown by the testimony of witnesses and by the overcoat, which is before us; and the blood on the coat seems to have come only from the wound on the right side of his body. On the inside of the coat on that side is a bloodstain that can be covered by two hands and on the outside is a bloodstain that can be covered by one hand. These appear on that part of the coat that covered the back of his right shoulder and evidently ran from the entrance of the wound below his right clavicle. While he lay on the bed awaiting the undertaker, the blood from this wound made such spots on the bedding as would naturally follow from what blood would seep through the overcoat at the point on the back of the shoulder. The other wound was under the left arm, approximately as high as the left nipple. When the undertaker arrived about 10 o'clock, he removed enough clothing to examine the wound and the chest. The evidence is somewhat confused, but it would seem to indicate, though not definitely, that while at the home the undertaker removed all the clothing, probably after taking the body from the bed. He testified that the bleeding had been internal and the thoracic cavity was full of blood; there was little blood on the outside of the body except below one of the wounds (which one was clear to the jury but not to us, as we cannot visualize the place indicated on the counsel's body by the words "about in there"). No blood from the wound on the left side left any perceptible stain on the overcoat. His other clothing received and absorbed considerable blood according to the testimony. A neighbor took home and burned the feather bed and a blanket and the undertaker burned the clothing after taking the body to Rushville to prepare it for burial.

Eunice Westervelt testified that she was sleeping in the front room upstairs, with the east window open, and did not hear the car drive in, nor did she hear any shots; the first thing she heard was the defendant calling something at the door; shortly her mother called that Ferris was badly hurt and within three minutes she was downstairs, and then her father asked her to help defendant carry her

brother in, which she did; she describes the position of her brother's body much as her father did and says there were no indications of life in the body; as soon as they laid the body on the bed her father directed her and defendant to go down in Wayne's car to Carl Johnson's to get her brother Will; she saw no gun; they got in the car and he turned on the lights and drove to Johnson's house, some distance south, and drove east up to the house along a lane that is fenced to within 25 or 30 feet of the house, where there is a gate; she got out of the car, went back of it, and then up to the porch, leaving defendant sitting in the car; as she went back of the car she placed her hand on it and there was no gun there; the car was facing east and seven or eight feet from the gate; she got her brother and as she got out to the car Wayne was coming from behind it; all got into the car and drove away; that on the way down she had asked defendant how the shooting had happened and he said that, when he and Ferris stopped at the house, Ferris got out and he sat in the car talking to him as usual; that "Ferris reached in to get the gun and the gun in some way became entangled in the robe and fired once, and he saw Ferris was going down so he got out as quickly as he could on the south side of the car, or left hand side of the car, and ran around the back of the car, and when he got there he put his arm under Ferris to support him; and as he did that the second shot went off and he was burned on the finger at that time."

Will Westervelt, the brother, aged 23, testified that, when he and Eunice came from the Johnson house to get into defendant's car, the defendant was standing on the south or right-hand side of the car and that the defendant got into the car from that side and then took the driver's seat on the left-hand side; the witness did not see any gun in or around the car; when defendant turned the car around in the yard "the car was facing east and he turned to the south, and I should say it wasn't more than 125 feet, the circle, or half circle he made to get turned around to the

west;" that the next day Wayne described to him how Ferris was shot, but told him only about one shot.

Elmer Johnson, a cousin of Carl Johnson, was staying on one of his cousin's places three miles north of Rushville and heard of the shooting the night it occurred; he went up to Carl Johnson's home the next morning about 5:30; the house is about 40 rods east of the main road; he had heard that the gun could not be found and he went to look for it, as he had been at the Westervelt home the night before and heard that the gun was laid on the back of the car and might have dropped off when they went after Will; he testified, on direct examination, that he found it about 100 yards south of the Carl Johnson house and testified later in the trial that he found it 200 or 300 feet from the gate.

Jeffrey Westervelt, the father, testified that the defendant did not tell him the way in which the shooting happened until after Will had been brought home. Then "he told me that he and Ferris were standing beside the car and one of them, he couldn't tell which, reached in the car to get the gun, and as it was pulled out it was discharged, and he said there were two shots fired so close together he could hardly distinguish but one report."

Clyde Pace, a theatre manager of Gordon, called by telephone by defendant and told that Ferris had shot himself and asked to come and bring some one to drive defendant's car back, got Albert Austin, and also took defendant's wife to the Westervelt home and returned with defendant and wife in the car of witness. He testified that after they got back to Gordon, in front of the house of defendant's mother-in-law, the defendant told him how the shooting occurred. "I don't remember whether he said he was standing out of the car or not, but he said Mr. Westervelt was pulling the gun out and it went off, and he ran around the car. I don't remember whether he got out of the car or not, but I remember him saying he ran around the car and picked him up, and he said he was making a kind of gurgling noise with his mouth and then the gun went off again."

Albert Austin drove the other car to Gordon and was present when defendant told how the shooting occurred. He related it on direct examination as follows: "Well, he said they stopped up there in the yard and Ferris got out and was pulling the gun towards him, and he was going around back of the car when the first shot occurred, and he ran around and picked him up, put his arms under his arms and picked him up, and the gun fell across to one side and went off again." On cross-examination the witness testified the defendant said that when the gun went off the second time he was shot in the finger. There was a blanket on the seat of defendant's car and a fur robe on the ground at Westervelt's. Witness drove the car to Gordon. There were two or three little smears of blood on the windshield, some on the instrument board, and a little on the gearshift lever, such as might be made by a bloody finger. There was no blood noticed by witness on the blanket or car otherwise than above.

R. M. Bruce, the sheriff, testified that, after his arrest, the defendant told him he was going around the front end of the car as the first shot went off and Westervelt began to go down "and run in back of him and put his arms under young Westervelt and about the time he did that the second shot went off, * * * and he said that was when he got his finger powder-burnt or shot. I asked him what he done then and he said Westervelt continued going down and he just laid him down and went in the house and called Mr. Westervelt, or called the family. And a little later I asked him if he knew what was done with the gun, and he said he picked the gun up, took the shells out and went and laid it on the back of the car. * * * Later on I asked him about the shells, and he said he put the shells in his pocket. * * * He said later on, down at Gordon one day, he got out his raincoat or light coat, and he had taken the shells out and burnt them."

The defendant did not take the stand on the first trial, but he testified on this, the second trial. Evan J. Furman, a witness for the state, had testified that he had sold the

Chevrolet roadster, model 1925, to defendant; that the back of the car slopes and is practically smooth; that about 7 o'clock on the night of October 8, 1925, he had fixed a burnt-out fuse for the car at his garage at Gordon and defendant and Ferris Westervelt left in the car; that he noticed a gun between defendant, who was driving, and the left-hand side of the car. Defendant testified that the gun was carried in the car between him and Ferris and that he doubted if he could operate either the clutch or the steering wheel with the gun between him and the door at his left. He thinks it was about 9 o'clock when they left the front of the theatre in Rushville, where he had driven so Ferris could see the time by his watch; they then went to the Westervelt home; that he got out of the car on his side first, and the gun which was between them and had been leaning on him slid over towards him and one or the other of them pushed it back towards the middle of the seat, and that this is what he told the father; he got out of the car on his side, walked around back of the car, got the rubber boots, gun-belt and cap, took them out of the car and threw them down by the gate and stepped up to where Ferris was taking the gun from the car; the fur robe was over the gun. "Well, I had stepped up just back of Ferris, a little bit to the left of him, when there was an explosion of the gun, and I remember seeing the flash. * * * Just a flash of light shone over his shoulder. * * * That was the first shot? * * * Well, he kind of crumpled, and I grabbed him."

"Q. I wish you would take hold of me the way you took hold of Ferris Westervelt that night after you saw the flash over his left shoulder. A. I was standing in this position (indicating), and I saw this flash against the side of his face, against the collar of his coat, and when he started to crumple I grabbed him and spoke to him (grabbing Mr. Harrington under arms). Q. And what happened then? A. Well, there was a sort of gurgling sound in his throat, and as he went down why there was another explosion from the gun. Q. What happened to you? A. Well, I remember

there was a sharp pain in my finger. Q. Which finger? A. My right index finger; and I spoke to Ferris again, and there was no answer, and I laid him back down by the car. Q. How long did you remain there with him and speaking to him, trying to talk to him? A. Well, I couldn't say. I was there a minute. I spoke to Ferris, called to him, and shook him. Q. Did he respond in any way? A. No, sir. Q. Then what did you do? A. I run into the house and called the family. Q. Who was the first person you managed to arouse? A. I think it was Mr. Westervelt that answered first. Q. And then after a bit did he come out? A. Yes, sir; I went back to the body where Ferris was lying, and in a minute Mr. Westervelt came out."

The defendant further testified that "the body was laying practically horizontally with the car. (He probably means at right angles, though at another place he says it was "parallel.") The gun was laying about such an angle as this (indicating), and when I knelt down besides the body I kicked the gun over towards the car with my foot." He says that later, before going for Will, he broke the gun, took out the shells and put them in his pocket, and laid the gun on the sloping back of the car, but on which he says there was an iron key extending two or three inches up from the keyhole of the rear compartment, and back of the car was a tire carrier with a spare tire; that the gun could not have slipped off the car at the rear, but would have had to fall off one side or the other on the trip to the Johnson place; that defendant did not put the gun where it was found in the Johnson yard; that he wore gloves that night, the one on his right hand was torn by the shot and was wet with blood, and after the excitement subsided he took it off and put it in the cookstove at the Westervelt home; a day or two afterwards he felt the shells in his overcoat pocket and threw them in the stove at his mother-in-law's home; that the blood in the car came from his right index finger; and that that finger was treated for three weeks or longer.

The body of Ferris Westervelt was buried at Tilden,

Nebraska. In March, 1926, it was exhumed and an autopsy was there performed by Dr. Perry Allerton and by Dr. C. C. Barr of Tilden, in the presence of the late Judge Edmunds, then county attorney, and of Sheriff Bruce of Sheridan county. A photographer also took two pictures of the body, which are in evidence, one before the examination and the other afterwards. In the second picture small sticks were inserted in the gunshot wounds to indicate the place of entrance and the course of the wounds. They aid in making clear the testimony of the doctors that the left shot entered about the anterior axillary line, level with the fifth rib, extending upward and backward and lodging at about the second dorsal vertebra; the right shot entered below the clavicle about four inches above the right nipple and extended inward and perhaps a little downward to a point near the second dorsal vertebra about an inch and a half from the termination of the other shot. Both wounds terminated about an inch from the back surface of the body.

The overcoat which is before us shows that it was not touched by the shot which entered the left side of the body, but that the shot which entered the right side made a hole less than an inch in diameter. This coat is burned or powder-marked around the hole over a circular area of probably two inches in diameter. The coat collar was turned up when the wearer was shot, because, when the collar is down, the hole made by the shot is covered by that part of the collar below the notch on the right lapel.

Dr. Perry Allerton of Tilden assisted his partner, Dr. C. C. Barr, at the *post mortem.* He testified: The wounds both touched the lungs; the lungs were collapsed; more tissue of the left lung was collapsed than of the right because the wound entered lower; the left wound was undoubtedly fatal; there must be some slight external bleeding from the right wound, not much from the left; from the two wounds the man would die in a very short time, a few minutes, 10 or 15 minutes. We say a person is alive when we can feel his pulse; there might be an involuntary movement; he might be able to throw his arm up. There

might have been a shot or two in the aorta, but it was not severed; the course of the shot was not near the vagus, cardiac or phrenic nerves.

Dr. C. C. Barr testified that the spinal cord was severed at the level of the second dorsal vertebra; after that severance there could be no conscious motion below that point; the arms would have partial motion; the left wound would cause death in a few minutes; there might be voluntary motion above the wound, as the turning of the head or the movement of the arm, and possibly below there would be twitching or involuntary movement; the aorta, which is an inch or an inch and a quarter wide, was punctured by a "bullet" or "bullets" (meaning "small shot") ; the subject might live 5 to 15 minutes, that is, there might be evidence of life that long.

Dr. Broz, of Rushville, was called to the Westervelt home and arrived there between 9:30 and 10 o'clock October 8. He examined the body of deceased; *rigor mortis,* which sets in from two to six hours after death, had not set in and the body was still warm under the clothing; he was the only doctor who examined the body before interment; he described the external wounds and such evidences as he derived by slight probing with his finger; powder burns around the wounds indicated that the gun was held close to the body; he found what appeared to be a powder burn on the index finger of defendant's right hand; he treated it, gave defendant "a shot of anti-lockjaw serum" and told defendant to see his doctor at Gordon; the witness remembers blood on the underclothing and clothing of the deceased; with such wounds there would be little external bleeding.

Dr. Overmass of Gordon treated the finger wound for several weeks; it was a slight wound, about the size of half a white bean cut in two.

On this trial two witnesses from South Dakota were called by the defendant. They testified that at about the hour when defendant appeared at the Westervelt home and aroused the family they were replacing a tire on their car

on the road about "five miles" north of Rushville. George Deemer, one of them, testified that he knew the Westervelt place well and that they stopped about 9 o'clock to change their blown-out tire about 200 yards east and a little north of the home. He and his brother-in-law, Jerry Soles, were there probably 20 or 25 minutes. While there a car, with lights on it, came to the Westervelt home. They did not pay any attention to it, but after it stopped they heard two shots "close together." On cross-examination he said he had heard that was where the Westervelts lived "because Charlie Rush had owned that place." The shots came from the southwest. The only way they could judge the distance of 200 yards was by the sound. Jerry Soles testified to hearing the two shots. He learned about the death of Ferris the next day in Gordon. He never told about the incident until now because no one asked him. On cross-examination, at first he maintained that the first man he told it to was defendant's counsel, but after considerable equivocation he answered that he had first discussed the matter with Frank O'Rourk.

Jeffrey Westervelt, on rebuttal, testified that Charlie Rush's place was a mile north of his place; that so far as he knew his place had never been known as the Rush place, and that a search of his abstract of title did not show that Rush had ever owned it.

The shotgun was in evidence. As described in our former opinion: "The right hammer of the gun is defective, and it was this hammer that the deceased had riveted and repaired, long prior to the evening in question." However, under the evidence in this trial, the jury would be warranted in finding that defect has no influence on the firing qualities of the gun.

In his opening statement for the state, Mr. Prince said: "The gun has a safety-lock device by which you cannot fire that gun by any jar, unless some man has hold of the trigger of that gun." Following is an abstract of the testimony of the state witnesses relating to the gun:

E. F. White, of Chadron since 1899, handles firearms.

The week before the trial he examined lock to see that it was not defective; says it is not defective; standing in front of the jury, explains the mechanism of the gun and states to the jury that you can raise the hammer from half-cock position back to the full-cock position, "but in no way can you let the hammer go to the firing pin without pulling the trigger." Witness removes barrels from stock and removes locks; explains to the jury, in answer to a question, "Why you say it cannot be fired that way;" and the locks are passed to the jury for examination; witness testifies that on last Friday night, at the request of Mr. Jordan, county attorney, he made a test of the gun, and again on Saturday made another test, in the presence of McNeff, deputy sheriff, Mr. Earlewine and Mr. Byerly; the test on Friday was made with Mr. Jordan present, over the hill north of Chadron about a mile and a half; the gun could be fired after raising the hammer by pulling the trigger only; they made 20 or 25 trials; then on Saturday, White, Earlewine, McNeff and Byerly went along the hillside north of Chadron and took several shells along and "tried in every shape, every manner we could think of, to discharge this gun without pulling the trigger" and it was impossible to explode a shell; they probably made a hundred trials, each man trying it; the little piece of one of the screws broken off the lock does not in any manner affect the mechanism of the gun; they tried with their thumbs, without using the trigger, and "drug it over the top of fence posts, and over a barbed wire, and we was unable in any manner to discharge the gun or even have the hammer snap;" in the opinion of the witness the hammer cannot be forced down on the firing pin without the trigger being pulled.

O. C. Earlewine, a resident of Chadron for 24 years, an undertaker, familiar with firearms, explains the action of the hammers, and that there is no way to discharge the gun unless something caught the trigger and pulled it off right; that you could strike the hammer, but you "would have to break that dog, and the chances are break the hammer, and then you would not fire the gun;" he partici-

pated with McNeff, White and Byerly in the tests and his evidence is about the same as that of White; but they could not discharge the gun in any way except by pulling the trigger.

B. L. McNeff, deputy sheriff at Chadron, participated in the tests on the Saturday before the latest trial, with about the same results detailed by the other witnesses.

Elmer Byerly, confectioner at Chadron, participated in the Saturday test before the latest trial, with the result that they were not able to discharge the gun without pulling the trigger.

E. F. White recalled, puts the gun together, produces two blank shells "unloaded, but with the caps on," draws the hammer back as far as he can and lets it go without touching the trigger, and releases the right hammer three times and does the same with the left hammer four times, removes the shells, and neither has been exploded; he expresses the opinion that the hammer cannot be forced down on the shells enough to explode it without pulling the trigger.

Jeffrey Westervelt, recalled for cross-examination, says that Ferris brought the gun home from the eastern part of the state somewhere. It was then a used gun. Witness also says that Ferris riveted one hammer on the gun at home. This was the right-hand hammer.

The above is all from state witnesses, and is believed to be all they have testified to relating to defects in the gun. The following is from witnesses for the defense on the same subject:

Charles H. Townsend, living south of White Clay, Nebraska, is familiar with guns; testified to two instances in which his own gun had gone off without pulling the trigger; he investigated and found the locks very dirty and interfering with the action of the safety springs; on one occasion, going over a fence, he struck one hammer on the wire and discharged one barrel of the gun.

John Baer, Chadron born and raised, precinct assessor, has had a Smith gun 14 years; his gun went off last fall

without pulling the trigger; some times guns go off when worn and sometimes if dirt, sand or anything else gets under the springs that hold the hammer back; in fact, he states that his old gun went off accidentally twice last year; he has one like the gun in evidence and another that is hammerless. (Comment: Here the gun is again taken apart and analyzed before the jury.) About the only difference between a hammer gun and a "hammerless" gun consists in the fact that in the latter the hammers are on the inside and on a hammer gun the hammers are on the outside.

Clarence L. Gibson, confectionary business, knows about firearms and safety devices; was one of the boys overseas; has a hole in his garage where his gun went off when he set it down on the floor, although the safety was on; this was a Fox, but is the same as a Smith; once was shooting at the traps and one of the guns went off from a similar cause; this was a hammerless gun but the safety was on.

J. H. Ewen, aged 63, Chadron, recently moved from eastern Iowa, was jeweler and gunsmith for 45 years, understands make of the L. C. Smith, Fox, Parker, Remington, and many other kinds, explains works to the jury; thinks Parker, Fox or Ithaca have a safer device than the Smith, considers "any gun dangerous; without lock, stock or barrel," never knew a shotgun made that did not go off accidentally under some conditions; sand, weeds, too much oil, dust and dirt accumulating in the oil and getting under the leaf and weakening them away from the bearing points are some of the causes; then a blow, or some such thing, can explode the cartridge; you can discharge a gun without ever pulling the trigger (indicating to the jury how the hammer can go past the notch with the safety on) ; has had his gun go off when he struck it on something; there is a hole in his ceiling right now; weeds can work through the stock into the lock and set off the gun just as the stick the witness used; the hammer gun is more likely to go off than the hammerless.

W. T. Wyckoff lives in Gordon, knew both boys, hunted

with them either the 26th or 27th of September, 1925, 25 or 30 miles south and a little east of Gordon; each had a gun, Ferris had one L. C. Smith double barreled (exhibit looks like it) ; it had a hammer loose that day and was kind of ricketty; it went off, one barrel after another, and Ferris said that when he pulled one trigger both barrels exploded; he said it was not working right and Ferris told him he might take it to shoot at a bird; he shot at a duck, pulling one trigger only and the first barrel set off the second one.

Ed Young lives in Bennett county, South Dakota, north and east of Gordon; Ferris and Wayne were at his place the day before Ferris died; owns an L. C. Smith hammer gun, which discharged "itself accidentally just riding along;" he had it laid across a saddle, riding along a creek.

It is not necessary to show motive for a homicide, but a motive is a circumstance which may be taken into consideration with other circumstances and evidence to be weighed in determining the guilt of one accused. The state undertook to prove a motive in connection with certain life insurance on the life of Ferris Westervelt and in connection with a note and chattel mortgage. In the former opinion it was held that the state had failed in its proof of motive in relation to the life insurance and that the court therefore erred in refusing to give an instruction, requested by the defendant, that the jury should disregard the evidence relating to the insurance policy in question. This holding was required by the evidence on that trial, the conclusion in regard to which was stated in connection with the holding in these words: "Therefore, as before concluded, it is clear that the defendant was without interest in the policy for $15,000, and could in no manner benefit by Westervelt's death, which fact he was cognizant of long prior, up to, and at the time of the death of deceased." It is just as true from the evidence on the later trial that the defendant could not take benefit from the policy, but the evidence in the instant trial so differs from that on the first trial that it is here an issue of fact as to whether defendant was cognizant of lack of beneficial interest in the insurance

policy. The $15,000 insurance policy is described and the evidence relating to it is stated in the former opinion much as it is shown in general in the evidence on the present trial. Not unduly to prolong the statement here, we refer to that opinion for the general statement. But on this trial the evidence as to defendant's knowledge and belief as to the situation relating to the policy differs materially from the evidence on the former trial, as will appear from the following:

Dr. Broz, local medical examiner, testified that he never examined deceased for insurance purposes but once and that was for the $2,500 policy; that the $15,000 entry on the medical report following the $2,500 item was not written by him, and that Ferris Westervelt and he never talked about a policy of that size. The state's evidence proved that the separate application for the $15,000 policy was signed in the handwriting of the deceased, and, after the state had spent considerable time in offering testimony to prove that the body of the application was filled out by other than his handwriting with particular reference to the "$15,000" and for the benefit of "creditors and partner" and "Balance to partner, R. W. Bourne," it was admitted, on behalf of defendant, that these items were all written by the defendant. It was the theory of the prosecution that Ferris Westervelt was procured to sign applications in duplicate, and that the one was used to apply for the $2,500 policy he intended to procure in favor of his mother and the other was used by defendant to procure a $15,000 policy about which deceased knew nothing.

The policy for $2,500 in favor of deceased's mother was written by the company, sent back and delivered. The company also wrote the policy for $15,000, making it in favor of the estate of Ferris Westervelt instead of to "creditors and partner" and returned it to O'Rourk, the general agent, with blank forms of assignment and with the explanation that it could not be made to such a beneficiary as named in the application. No assignment of the policy was ever executed. Mr. O'Rourk put the policy in the safe.

O'Rourk testified briefly in the present trial. We do not find anything in his testimony to indicate that the defendant ever saw the $15,000 policy before Ferris Westervelt was shot. The defendant, on cross-examination, admitted that he never examined the policy before the death and "never saw it until the next day or two after his death; possibly the next day." He testified that he had received a letter from the insurance company at the time the policy was issued, calling his attention to the necessity of an assignment, but he is unable to produce the letter. John G. Maher, of Lincoln, president of the insurance company, testified that it was the custom when such a letter about a policy was sent to a general agent to send a copy to the sub-agent producing the business, but he could not say whether such a letter had been sent to defendant. The insurer limited its risks to $5,000 and had reinsured the $15,000 risk.

Charles M. Rowan, of Chicago, an investigator for the Zurich Insurance Company, interested as a reinsurer on the life of Ferris Westervelt, testified that about November 10, 1925, he was directed by his company and came to Lincoln; went to the office of the Old Line Insurance Company and met Mr. Maher and later in the day met O'Rourk there; later that day they met by appointment in Omaha and he also saw and conversed with defendant that night at the Rome Hotel; that later he had a conversation with defendant at the Fontenelle Hotel about the insurance, and defendant told him he had never seen the policy until after the death of Ferris.

In addition to the state's claim of motive relating to life insurance, it presented evidence in relation to a chattel mortgage to secure a note for $1,500 and used by defendant as collateral security for a loan of $700 obtained by de-defendant from the American State Bank of Gordon. There was testimony from an officer of the bank that defendant, on August 10, 1925, first presented as collateral an unsecured note for $1,500, purporting to be signed by Ferris Westervelt. The banker asked for further security for the collateral note, as Ferris was not known to the bank or

known to be financially responsible. Defendant departed and on the same day returned with a chattel mortgage covering 193 hogs, purporting to be signed by Ferris Westervelt, to secure the $1,500 note maturing November 15, 1925; the money was loaned on the strength of the security and several times the officer of the bank talked with defendant about the note and mortgage; that, when the bank learned of the death of Ferris Westervelt, the defendant stated that he had been or would be appointed administrator and would sell the hogs and pay the note; later defendant said the hogs had been shipped and still later declared that some young man had the proceeds but never secured them; upon the bank looking into the matter it learned that deceased never had any hogs, and thereupon it received notice that if it would forward the note and mortgage to the Union Bank of Rushville it would be paid. The papers were so forwarded and the evidence shows the note and mortgage were paid to the Rushville bank by defendant's aunt. The papers were turned over to her, and upon the state demanding them at the trial it was admitted on behalf of defendant that they had been destroyed and could not be produced. A copy of the mortgage had been recorded. It showed that the defendant had inscribed as the only witness to the execution of the mortgage. When the bank was investigating the mortgage, it exhibited the original chattel mortgage to Jeffrey Westervelt, the father of deceased, and he examined the signature. He testified that in his opinion it was not the signature of Ferris. He thought the signature to the $1,500 note was that of his son; but testified that defendant never filed or made any claim against the estate of the deceased on account thereof. The state argues that motive for the murder lies herein because defendant wished to do away with proof of his forgery of deceased's name to a chattel mortgage on nonexistent property.

Also the state produced evidence that defendant asked to be and was first appointed administrator of the estate of deceased; in the petition for appointment he estimated the value of the property of the deceased at $2,500; there was

no such property and defendant knew the $2,500 policy of insurance was in favor of deceased's mother and could not pass through the estate; that Bourne never mentioned the $15,000 policy to the father; that some time after his appointment Bourne and O'Rourk came to the Westervelt home and one of them said, but both were present when it was said, that they were going to get at least $5,000, and "we are going to get $6,000 for you if we can, if we have to lie like the devil to get it." The state argues that defendant's scheme or plan was to get a settlement from the insurance company on the estate policy and surreptitiously conceal the bulk of it from the estate.

The foregoing covers the main features of the case, perhaps already extended beyond warrant in the telling. The question, whose answer we are to deduce, is whether there was sufficient evidence to submit to the jury and to support the verdict of guilt.

This is a law case. We are not permitted to try it *de novo* on the record as we do an equity case. It is not a question as to what we would have decided if we had been jurors. Society has committed the findings of fact to the chosen jury in such a case. The jury were properly instructed by the court as to their legal duties and as to the application of the law to the facts presented in the evidence.

The defendant took the deceased from his home alive and well and he restored him the night of the following day lifeless and voiceless. As the dead cannot speak, and as the guilt of the defendant must be proved by the evidence beyond a reasonable doubt, the only way to prove guilt generally is by the circumstances in the case. Yet when the defendant testifies, as he did here, and proffers an explanation, his testimony, weighed and tested in the light of the circumstances and of his personality and manner, may also aid the jury in discerning the truth.

The defendant testified that the deceased shot himself accidentally. It seems to us that the manner and type of the wounds is perhaps the strongest circumstance in the case to be considered by the jury as proving the case and

as impeaching the explanation of the defendant. The wound under the left arm and the wound on the right side were made by two gunshots at about right angles to each other. A considerable and appreciable time must have elapsed, either for the position of the gun to have changed or for the body to have rotated 90 degrees so that these wounds could have been inflicted. In view of the evidence relating to the condition of the gun, the jury might have found that these wounds could have been made only by pulling the triggers of the gun; or taking the view of the evidence as to the condition of the gun that, when one barrel went off accidentally, it set off the other barrel, then the jury might have concluded that the accidental firing of the gun would have produced but one wound from the discharge of both barrels, or at most that no sufficient time could elapse between the two discharges so as to permit two wounds to be made so convergent as were made. They were not bound to credit the implications of the theory of defendant's testimony—in effect, that the deceased, in pulling the gun out, caused one accidental discharge, and then later, by some movement, caused another and separate accidental discharge of the other barrel of the gun. They might believe in one accident, but their credulity might halt at the acceptance of two accidents in such close succession.

That defendant's car had its lights off when his car stood in front of the Westervelt home; that he could drive from the highway to the house at that time of early night with the lights on, and that a shotgun could be fired twice so near the house, all without awakening any of the family; for what it is worth, the evidence as to the attempted concealment of the gun; all these are circumstances that might have been considered by the jury with other evidence, as indicative of guilt; and the jury probably disbelieved the testimony of Deemer and Soles that they were near the Westervelt home, saw a lighted car drive in and heard the shots.

As to the circumstances offered by evidence tending to show motive. The defendant admitted that he filled out the

application for the $15,000 policy to be made in favor of "creditors and partner." An insurance agent who did not know that such a policy would have to be made out to an estate as beneficiary rather than as applied for might well be considered by the jury as not really knowing that a policy he had never seen or inspected actually was so written that it would not benefit him in case of the death of the insured. The evidence as to the chattel mortgage being forged by the defendant as to the name of the deceased was a circumstance, for whatever weight it might have, to be considered by the jury.

On the whole, we think that the evidence was sufficient to submit to the jury and was sufficient for the basis of a valid verdict. Two juries, in different venues, on substantially the same facts, have decided that the defendant was guilty. It is true we set aside the first judgment, but to the lay jury the force of the evidence and the instructions would, in the particular circumstances, appear about the same. At any rate, even if our verdict might, perhaps, be different, we decline to overturn the verdict rendered by the jury on facts and circumstances which we hold to be sufficient.

For the reasons given, the judgment of the district court is

AFFIRMED.

THOMPSON and EBERLY, JJ. dissent.