JOSEPH VENEZIANO V. STATE OF NEBRASKA.
297 N. W. 920

FILED MAY 9, 1941. No. 30963.

*O'Sullivan & Southard,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke,* contra.

Heard before SIMMONS, C. J., EBERLY, PAINE, MESS-MORE and YEAGER, JJ., and LANDIS and MUNDAY, District Judges.

MESSMORE, J.

The information charged the defendant with murder in the first degree substantially in the form as set forth in *Nichols v. State,* 109 Neb. 335, 191 N. W. 333, which has been followed from its inception to and including the case of *Chadek v. State,* 138 Neb. 626, 294 N. W. 384, wherein the form of information was reaffirmed. Defendant was convicted of murder in the second degree and sentenced to 10 years in the penitentiary. As plaintiff in error he brings the record of his trial and conviction to this court for review.

Plaintiff in error (hereinafter referred to as defendant) first contends that the information is insufficient in law, in that it fails to charge the crime of murder in the first degree and lacks a sufficient allegation of intent to commit murder in the first degree. The argument in support of such contention has been carefully reviewed. We conclude that, in view of the decisions of this court dealing with the same subject-matter, such argument is without merit. This court has determined adversely to the defendant on such question in *Nichols v. State, supra; Phegley v. State,* 113 Neb. 138, 202 N. W. 419; *Ringer v. State,* 114 Neb.

404, 207 N. W. 928; *Pembrook v. State,* 117 Neb. 759, 222 N. W. 956; *Sherman v. State,* 118 Neb. 84, 223 N. W. 645; *Bourne v. State,* 118 Neb. 862, 226 N. W. 784; *Trosper v. State,* 128 Neb. 165, 258 N. W. 62; *Chadek v. State, supra.*

In *McKenzie v. State,* 113 Neb. 576, 204 N. W. 60, this court held: "When an information alleges all the facts or elements necessary to constitute the offense described in the statute and intended to be punished, it is sufficient." Followed in *Chadek v. State, supra.*

The information in the instant case does not violate due process of law and equal protection of the law as guaranteed by the federal Constitution. *In re Robertson,* 156 U. S. 183, 15 S. Ct. 324; *Bergemann v. Backer,* 157 U. S. 655, 15 S. Ct. 727; *Caldwell v. Texas,* 137 U. S. 692, 11 S. Ct. 224; *Chadek v. State, supra.* In the *Chadek* case it was held: "The sufficiency of an information charging an offense under the law of a state (murder in the second degree) is not a federal question." The information in the instant case is sufficient in form to charge the offense of murder in the first and second degree.

Defendant next contends that it was error on the part of the trial court not to submit the crime of manslaughter to the jury. This question arises over the sufficiency of the evidence to disclose whether or not there was a sudden quarrel. From the record it is apparent that defendant's theory is that he was attacked; that from the nature of the attack he had reason to believe, and did believe, there was a design to take his life or do him great bodily injury; that he was justified in killing his victim to prevent loss of his own life, or the infliction of great bodily harm upon him; that is, he killed Tony Tarascio in lawful defense of his own person.

Manslaughter is the unlawful killing of another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of an unlawful act. Comp. St. 1929, sec. 28-403.

The record discloses: The defendant, a man 25 years of age, weighing about 130 pounds, was engaged, with Tony

Tarascio, in the trucking business for about three months. Both had gone together on the trips, with the exception of the last two, when defendant gave as his reason for not going that Tony carried a gun. The moneys collected from the enterprise and accounts thereof were kept at the home of defendant's mother, who apparently financed the partnership. The defendant was to handle the money and pay the bills. Tony had not accounted for moneys collected on the last two trips. The defendant went alone to Tony's home, failed to find him, and later that evening, September 1, 1939, at 9:25, defendant, accompanied by three men, returned to the Tarascio home, defendant's purpose being to collect some money which he and Tony owed an employee. When they arrived, Tony was near his truck.

Mrs. Tarascio testified: On the evening her husband was killed, he came home from Milwaukee about 6:30; defendant had been there and inquired about him, but he was not at home; Tony returned, about 9:25, with his truck; she was standing by the truck, telling him how it should be parked, when defendant and three others came in a car. The defendant and Simon, an employee, jumped out of the car; at this time her husband "was standing by the fender." Defendant asked him something, saying "Take this," and shot at him. He first shot at her, the gun clicked, and he then shot at her husband. When about 10 feet from Tony, defendant said: "Talk now;" she ran and stood in front of her husband and told the defendant not to shoot him; defendant ordered her to move, threatened her, and called her a name. After the defendant shot, he ran away, leaving Simon to help her move her husband's body to the sidewalk, which they did and took from his pockets a handkerchief, spectacle case, billfold, a comb and keys, but not a gun. A sister of Mrs. Tarascio saw the shooting, but heard no conversation between the defendant and Tony. She testified that at the time Tony was standing by the front fender of the truck, with his right hand in the hip pocket of his overalls; that she heard defendant say: "Let's go, boys, I got him."

One witness, who accompanied defendant to the Tarascio home, testified: Tony was east of the truck, leaning on it. Defendant said: "Let me see the bills," and Tony said: "Come in the house." Defendant turned and said: "Now, say something," and stepped toward Tony. The gun clicked the first time, the defendant shot into the ground and then shot Tony. This witness did not see Tony make any motion toward producing a gun and he saw no other gun at the time. After the shooting the defendant ran. Tony's father-in-law testified that he was home on the evening of the shooting, sitting in front of his house, with his family, Tony's wife and another daughter; he saw defendant and Simon come and heard an argument, and then "heard one shot quick, and the other two" shots immediately thereafter, and he heard defendant say: "Let's go." Defendant then ran away.

The inspector of detectives testified: Defendant came to the station after 12 o'clock on the same night and they had a conversation about the shooting, in which defendant stated, in substance, that he was in partnership with Tony Tarascio, who had hired Al Simon to go with him on different trips. Defendant asked Simon to go with him to Tony's home and have Tony account for some business. After arriving at the Tarascio home, defendant asked Tony to explain about the trip and expenses incident thereto, how much money he had, and to go to his, defendant's, home and check over the books. Tony said he would not go there, but for them to come to his home; one thing led to another and "they got talking pretty loud, so that Tony straightened up from the fender, on which he had been leaning, with his right hand in his pocket." The defendant thought he was going to shoot, so he shot first. The shot did not go off, so he fired two more shots; then ran. Defendant said he had purchased a small blue steel gun from a colored man for the sum of $2.

Defendant's version of what happened is, in substance: As soon as he got out of the car he asked Tony if he had any trouble on the last trip; Tony said "No;" defendant

went back of the truck and kicked the tires; he had worried about them because he had just paid $258 for them. He came back and said: "Al Simon wants some money; how about figuring up and paying him off." Tony said: "We will figure at my house from now on." Defendant said: "What do you mean?" Tony replied: "From now on I take care of all of the money and all of the bills." Defendant said: "That is not according to the agreement." One word followed another, and Tony started cursing and said something about breaking defendant's neck, put his hand in his right rear pocket. Defendant further testified he knew that his gun had an empty cylinder; that he shot once in order to stop Tony from pulling out a gun, and told him: "Don't take your hand out of your pocket." He had told him the same thing a short time before; he did not aim at him. After he shot, he stood there and saw Tony's hand "slide down in his pocket" and heard his wife screaming. Defendant was backing up all the time. He saw Tony fall and ran away. He further testified that Mrs. Tarascio was not near her husband at the time; that when he was examining the tires he saw her down in front of the house; that he did not go to the house to shoot the deceased, but shot him to save his own life. Defendant's gun was not registered, as provided by city ordinance. He denied that he said: "Now, say something," or "Let's go, boys, I got him." He further testified that the reputation of Tony Tarascio in the community "for being a violent, dangerous man" was bad; that Tony never "completely" got his hand out of his pocket and was four or five feet from him at the time of the shooting.

The witness Simon testified: He went with defendant to the Tarascio home to get some money ·due him. When they arrived, Tony, who was 29 years of age and weighed about 200 pounds, was near the front of the truck. The defendant said: "Tony, I want to talk to you." The witness then related the conversation about the books and money, as heretofore set out; that Tony "started yelling pretty loud about expenses" and told defendant he "would break his

neck." Witness saw that Tony had his hand in the right rear pocket of his overalls, and "it went down in his pocket further;" defendant and Tony talked about five or six minutes. Witness then told about helping to remove the body and taking from the right rear pocket a "twenty-two automatic gun." Simon and other witnesses testified that Tony was a dangerous man and carried a gun, and that his reputation in the community was bad.

The foregoing constitutes the evidence upon which defendant contends the court should have submitted to the jury the crime of manslaughter.

We conclude that the evidence is insufficient to disclose a sudden quarrel, or in any manner to meet the statutory conception of manslaughter. The defendant purchased the gun the day before the killing and from the time he bought it had carried it, loaded, in his pocket. Two witnesses who accompanied defendant and Simon to the Tarascio home testified that Tony did not change his position of leaning on the truck and did not remove his hand from the right rear pocket of his overalls during the entire episode. The defendant was not in immediate danger; his gun clicked once without firing; he fired one shot into the ground, and the third shot killed the victim, while he still had his hand in his pocket. No motion was made by the deceased to get a gun. No threats were made by him. He did not strike at the defendant, or go toward him as if to attack him. There was some controversy over the books, money and business, but not out of the ordinary. The evidence discloses the shooting was unprovoked. Some question arose, and the evidence is in conflict, as to whether or not the deceased had a gun. Simon told the police that, when he and Mrs. Tarascio removed articles from deceased's pockets, they found a gun. One time he said it was a revolver; then said it was an automatic, and, when challenged by the widow, he said he might have mistaken the spectacle case for a gun. Deceased never displayed a gun at the time, nor said anything to warrant any one in believing that he had a gun. Some contention is made that deceased said he would

break defendant's neck, but he surely made no effort to make the threat good, assuming it was made.

We are met with the argument: "It is the duty of the trial judge, particularly, in criminal actions, to instruct the jury as to the rules of law governing the disposition of the cause, whether he is requested to do so or not; and if a charge to a jury, by omission to instruct on certain points, in effect withdraws from their consideration an essential issue of the case, it is erroneous." *Young v. State,* 74 Neb. 346, 104 N. W. 867.

The inference to be drawn from the voluntary use of a deadly weapon upon a vital part of another is entirely for the jury, and whether the defendant acted with malice is a question of fact for the jury, to be determined like any other question of fact, from all of the facts and circumstances shown by the evidence. This is true when the facts and circumstances surrounding the killing are fully testified to by eyewitnesses, as in the instant case. *Davis v. State,* 51 Neb. 301, 70 N. W. 984.

Under the evidence, it is obvious that, if we give to it a proper legal construction and application, the defendant was guilty of murder in at least the second degree, or he was entitled to an acquittal, because he acted in defense of his life. It was the theory of the prosecution that the crime was either murder in the first degree or murder in the second degree; the evidence tended to establish such theory, and the ingredients of the offense of second degree murder are present. The defense was that the defendant lawfully killed the deceased in order to save his own life. This was the issue submitted to the jury by the instructions of the trial court. No instruction, defining manslaughter, was requested at the time, and it is apparent from the evidence that such an instruction would have been inappropriate. The court is only required in instructions to state the law applicable to the facts proved and those which the evidence tends to prove. *Clark v. State,* 79 Neb. 473, 113 N. W. 211, on rehearing, 79 Neb. 482, 113 N. W. 804; *Kennison v. State,* 83 Neb. 391, 119 N. W. 768; *Williams v. State,* 103

Neb. 710, 174 N. W. 302; *Braunie v. State,* 105 Neb. 355, 180 N. W. 567; *Simmons v. State,* 111 Neb. 644, 197 N. W. 398; *Wever v. State,* 121 Neb. 816, 238 N. W. 736.

Other assignments of error are without merit. For the reasons given in this opinion, the judgment and sentence of the trial court are

AFFIRMED.

MUNDAY, District Judge, dissenting.

I am unable to agree with my brothers, in approving the opinion of the majority, on the question of submitting the crime of manslaughter to the jury.

Section 28-403, Comp. St. 1929, defines manslaughter as the unlawful killing of another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of an unlawful act.

A "quarrel" is defined in Webster's New International Dictionary as "a breach of concord, amity, or obligation; a disagreement; an antagonism in opinion, feeling, or conduct; esp., an angry dispute, contest, or strife; a brawl; altercation."

That part of the definition applying to "an unlawful act" is not applicable to the instant case. How is that part applying to "the unlawful killing of another without malice * * * upon a sudden quarrel" applicable?

The controlling distinction between murder in the second degree and manslaughter is whether the defendant acted with malice, that is, with the purpose and intent to unlawfully kill the deceased. *Lucas v. State,* 78 Neb. 454, 111 N. W. 145. The question of malice, in any degree of homicide, is for the jury, where the circumstances are described by eyewitnesses and detailed by the defendant. *Vollmer v. State,* 24 Neb. 838, 40 N. W. 420. Therefore malice is not presumed in the instant case.

This leaves one element of the crime of manslaughter to be considered, in determining the defendant's right to have the crime of manslaughter submitted to the jury, i.e., the "sudden quarrel."

The trial court should not submit the charge of man-

slaughter if there is no evidence applicable to the charge. In other words, the court should instruct on the law applicable to the facts proved, and which the evidence tends to prove. An analysis of the cases cited in the majority opinion to sustain this well-recognized rule, and to sustain the trial court in not submitting the crime of manslaughter, reveals that the evidence is entirely different in the cases cited, excepting the *Kennison* case as hereinafter indicated, than in the instant case. These cases are authority for requiring the submission of the manslaughter charge under the facts and circumstances in the instant case. The cases are: (1) *Clark v. State,* 79 Neb. 473, 482, 113 N. W. 211, 804. The defendant was. convicted for the death of a conductor, while attempting to rob him. There is no evidence of a sudden quarrel; (2) *Kennison v. State,* 83 Neb. 391, 119 N. W. 768. The court gave instructions on *all degrees of homicide,* as well as self-defense and intoxication. There appeared to be no evidence that the killing was accidental; (3) *Williams v. State,* 103 Neb. 710, 174 N. W. 302. Defendant and others committed robbery. Officers went to arrest them, and the robbers immediately shot and killed an officer. There was no element of manslaughter; (4) *Braunie v. State,* 105 Neb. 355, 180 N. W. 567. Insanity was relied upon as a defense. The opinion states: "The only possible defense in this case was insanity;" (5) *Simmons v. State,* 111 Neb. 644, 197 N. W. 398. Judge Good in the opinion states: "There is no evidence in the record of any quarrel;" (6) *Wever v. State,* 121 Neb. 816, 238 N. W. 736. Defendant was found guilty of murder by administering strychnine. Where a defendant denies administering poison, there could be no sudden quarrel.

The question reduces itself to the exact point: If the defendant and his witnesses testify to facts, from which different inferences, as to a sudden quarrel, may be reasonably drawn, even though these facts are disputed, should the trial court submit the crime of manslaughter to the jury? Or, putting it differently, does the trial court have authority to pass upon such a state of facts and circum-

stances, and not submit them to the jury to determine the grade of homicide? For the court to pass upon such a state of facts would be denying the defendant a material right.

This court has answered the question. The second paragraph of the syllabus in *Denison v. State*, 117 Neb. 601, 221 N. W. 683, is:

"Where an information charges the crime of murder in the first degree, murder in the second degree and manslaughter are included in the charge, the degree ordinarily being for the jury; *and where the evidence and circumstances of the killing are such that different inferences may properly be drawn therefrom as to the degree, the court should submit the different degrees to the jury for them to draw the inference.*" (Italics by writer.)

A brief statement of the evidence for the defendant on this phase of the case is necessary to show the error in passing on the facts as to a "quarrel," and in not instructing on the crime of manslaughter: That the decedent's wife, who is a material witness for state, knew of no trouble between defendant and deceased; that there was no previous serious quarrel between defendant and deceased; that defendant went alone to deceased's home and deceased was not there and nothing was stated as to action indicating ill will on defendant's part; that defendant started to deceased's home a second time with Al Simon, who had the money coming to him from defendant and deceased, but had a flat tire, and then went with Barta and Benak, witnesses for state and Simon; that none of these witnesses related any statement made by defendant of ill will towards deceased; that Barta did not hear many of the statements made by Mrs. Tarascio and her sister, Mary Bersane; that deceased was a violent and dangerous man, as testified to by several witnesses; that defendant weighed about 130 pounds and deceased about 200 pounds.

Al Simon stated that he went to the deceased's home with the defendant, Barta and Benak to get the money that was due him; that deceased was near the front of his truck at

the time they arrived; that defendant said to deceased, "Tony, I want to talk to you," and that the defendant further said, "Did you have a good trip?" and that the deceased said, "Yes; I had a nice trip this time;" that defendant said, "Did you get all the bills?" and deceased replied, "I have all of them in the house." The defendant then said, "Go and get them and give Al his money, Tony; get your books and then come back and we'll check it at my house." Deceased then said, "We will not check it at your house no more," and then the defendant said, "Well, * * * what do you mean? We put in all the money. You were supposed to let me take care of the books." To this the deceased said, "We are not doing it any more. I will take care of my own money and my own books." Witness then stated that deceased started yelling pretty loud about expenses and things like that, and deceased told defendant he would break his neck; that the first he saw, deceased moved and had his right hand in his rear pocket, and when he moved he put his hand down further in his pocket; that they talked back and forth at each other for 5 or 6 minutes; that the deceased was physically strong and was about 29 years of age and weighed 190 to 200 pounds; that after the shooting he and Barta carried the body over to the fence by the house and that he and Mrs. Tarascio took different articles from the pockets of the deceased, including a ".22" tan automatic gun from the right rear pocket, being the same pocket the deceased put his hand in before the shooting; that he had made trips with the deceased and the deceased had a gun on him; that deceased's reputation for carrying a gun and for being a law-abiding citizen was bad.

The defendant testified in part:

"As quick as I got out of the car I told him, I said, 'Tony, did you have any trouble on this last trip?' and he said 'No.' And I went in the back of the truck and I kicked the tires, that was the only thing I was worried about was the tires; we just got through paying $258 for them, and I came back and I said, 'Al Simon wants some money; how about figuring up and paying him off?' So he said, 'We will figure

at my house from now on.' I said * * * 'That is not according to the agreement,' and he said a word and I said a word and he started cursing and said something about breaking my neck and * * * when he went in his hip pocket I fired. Q. Into what pocket did he go? A. Into the right rear pocket. * * * Q. Now, did you go over there for the purpose of shooting Tarascio that night or having any trouble with him? A. No, sir. Q. Why did you shoot him? A. To save my own life."

Defendant then stated: That he knew of the reputation of the deceased in the community for being a violent and dangerous man and that it was bad; that he did not say just before he shot, "Now, say something;" that immediately before he fired the shot the deceased seemed to be very angry with him and defendant was afraid of him; that he did not say after the shooting words in substance "Let's go, boys; I got him;" that he bought the gun with which he did the killing the day before the killing; that he kept the gun in his pocket loaded from the time he purchased the gun up to the time of the killing; that he did not buy the gun for the purpose of using it the way he did; that he carried it as he did not want his mother to know there was a gun in the house; that he tried to sell the gun the day he purchased it; that after he arrived at the truck where the deceased was they talked back and forth two or three minutes; that he (the defendant) was talking in a loud tone of voice, and that the deceased's wife was not near at the time of the shooting.

The foregoing testimony and evidence and inferences therefrom show that there is a dispute between the witnesses for the state and the defendant in some of the testimony relating to the sudden quarrel. The fact, that there is such a dispute and that the dispute is partly caused by defendant's statements, does not make the question as to the sudden quarrel any less a question for the jury. Al Simon in his testimony also disputes some of the witnesses for the state. He relates a rather extended conversation between the defendant and deceased continuing about 5 or

6 minutes. Simon's testimony shows that the defendant and the deceased disputed, and that there was a sudden altercation.

Referring to the defendant's theory of the defense in the case of *Young v. State*, 74 Neb. 346, 104 N. W. 867, the following language is used by Judge Barnes:

"With these conflicting statements in evidence, it was for the jury to determine who of the witnesses was entitled to the most credit, and which of them should be believed; and it was error for the court, by refusal to instruct, to ignore any part of the evidence. So we are satisfied that there was sufficient evidence introduced in support of defendant's theory of the homicide to require the court to submit it to the jury by proper instructions."

Who decides which of the witnesses are correct as to this sudden quarrel, the trial court or the jury? The facts and inferences therefrom should be submitted to the jury to decide as to the quarrel and the degree of homicide.

The fact, that no instruction was asked, is not controlling; it was the duty of the court to instruct as to rules of law applicable without request. *Young v. State, supra.* It is the information and the evidence submitted that determine the issues that are to be submitted to the jury.

It is stated in the opinion submitted that the defense was that the defendant lawfully killed the deceased to save his own life. The defendant was not obliged to rely only on the theory of self-defense. The defendant in pleading not guilty put in issue every charge and element of the crime included in first degree murder. Under the evidence there would be nothing inconsistent in the court instructing both on the crime of manslaughter and self-defense.

Judge Sedgwick, in *Lucas v. State, supra,* states the correct rule of law that should have been followed in instant case. In that case the defendant shot the deceased at a distance; defendant thought the deceased armed; he was not; defendant saw the deceased coming and went into the house and secured a gun and shot deceased; after the defendant shot once he shot a second time through the smoke

without waiting to see the result of the first shot. It is difficult to find as much evidence of a sudden quarrel as in the instant case. This court held that the questions of self-defense and manslaughter should be presented to the jury. The following well-reasoned statement from the opinion puts it well:

"If he (defendant) was not actuated by such desire and purpose to kill the deceased unlawfully, but killed the deceased under a mistaken notion that the circumstances were such as to justify the killing in self-defense, that is, if he acted unreasonably, rashly, and unnecessarily, but with a belief at the time that the law would justify him in so acting, and without any purpose or intent to kill the defendant unlawfully, he is guilty of manslaughter. If in killing the defendant he acted reasonably under the circumstances, that is, if the circumstances and appearances were such as to cause a reasonably prudent and cautious man to believe that such action was necessary to defend his life, then he is not guilty, and such action would be justifiable in self-defense."

The jury recommended leniency. The jury may have thought that the defendant was guilty, but that second degree murder was too severe.

For the reasons stated, the writer is of the opinion that a new trial should be ordered.