STATE OF NEBRASKA, APPELLEE, v. RODNEY L. STEWART, APPELLANT.

250 N. W. 2d 849

Filed February 2, 1977. No. 40329.

Frank B. Morrison, Stanley A. Krieger, David E. Kendall, Peggy C. Davis, and Anthony G. Amsterdam, for appellant.

Paul L. Douglas, Attorney General, and Paul W. Snyder, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

BRODKEY, J.

This is an appeal from the verdict of a jury, finding the defendant guilty of both first-degree murder and of shooting with intent to kill, wound, or maim; and also from the sentences imposed.

On January 30, 1975, the defendant was charged under a Grand Jury indictment which alleged in count I that he "did purposely and of his own deliberate and premeditated malice kill Thomas Ehlers," and in count II that he "did maliciously shoot Daniel Evans with the intent to kill, wound, or maim Daniel Evans." The defendant plead not guilty to both charges on February 6, 1975.

Trial was had commencing July 29, 1975, and the jury returned a verdict of guilty on both counts on July 31, 1975. On August 20, 1975, the trial court, after a hearing pursuant to sections 29-2519 et seq., R. R. S. 1943, sentenced the defendant to death on the charge of premeditated murder, and to 15 to 50 years imprisonment on the charge of shooting with intent to kill, wound, or maim. The defendant has now appealed his convictions and sentences to this court. We modify and affirm.

During the summer of 1974, the defendant, a 16-year-old high school student, became acquainted with Thomas Ehlers and Daniel Evans. In July or August 1974, Evans and Ehlers began to supply marijuana to the defendant, who agreed to sell it for them under an arrangement whereby the defendant was to pay the two suppliers a specified price for the marijuana he sold, and retain any excess money he received from the sales.

In one instance, Evans and Ehlers gave the defendant 12 bags of marijuana to sell for $10 per bag. The

defendant was to pay them a total sum of $100 on the transaction. The defendant sold seven bags, and gave Ehlers and Evans $70, but kept the remaining five bags for himself, telling the two suppliers that he had been arrested and that the five bags had been confiscated by the police. When Ehlers and Evans discovered this was not true, they confronted the defendant, but continued to supply him with marijuana. The defendant would return marijuana that he did not sell, but began to "pinch" some from the unsold bags that he returned. The defendant stated that he began to pinch some of the marijuana because he felt that he was not receiving adequate compensation for his sales.

Ehlers and Evans became angry over the defendant's deception and his failure to pay them the money he owed at that time, about $50; and confronted him on Thursday, January 16, 1975, approximately 10 days before the shootings involved in this case. Evans testified that he and Ehlers were "pretty mad," and that they yelled at the defendant on this occasion. Evans told the defendant that he did not want a fight to arise out of the situation. The defendant's version of this confrontation was somewhat different. He stated that Evans and Ehlers at that time threatened him with wrenches, and that Ehlers threatened to kill or beat him. The defendant told them that he would pay them some money on his indebtedness on the following Tuesday.

According to Evans, the defendant telephoned him on Sunday, January 19, 1975, and told him that he, the defendant, had a buyer for 2 pounds of marijuana, and that the profit from such sale would make up what the defendant owed to Evans and Ehlers. The defendant stated that Evans initiated this proposed transaction, although on cross-examination he testified that he was unsure who made the initial suggestion. In any event, the proposed sale was discussed during the following week, and Evans located a person who could

provide 2 pounds of marijuana. A compromise was reached on a rendevous, which was to take place Saturday evening, January 25, 1975. Evans did not want to meet the ultimate buyer, and the defendant wanted to meet no one but Evans and Ehlers. The two suppliers agreed to meet the defendant and drive him to a place near the buyer's house; the defendant would then get the money from the buyer, and come back to retrieve the marijuana. The proposed sale price for the marijuana was $600.

The defendant had not, in fact, located a buyer, and he stated that he simply intended to "rip them (Evans and Ehlers) off for whatever I could get." Defendant testified that prior to the meeting, he decided to take a gun to protect himself because he knew the two suppliers were angry with him, and he decided to take a can of gasoline so that he could cover up any shooting which might occur. Evans and Ehlers met the defendant in Ehler's van at 7:30 p.m., on January 25, 1975, and the defendant told them that the gasoline was for a friend he was meeting after the sale was completed. The defendant directed the two suppliers to Rose Avenue, near 16th and Boyd Streets, in Omaha and told them to stop the van.

Evans testified that when the van finally stopped, he suddenly felt as though he had been hit in the back of the head. He stated he heard two shots, that no warning was given before the shots were fired, and that no conversation took place when the van stopped. The defendant fatally shot Ehlers, who died instantaneously, and wounded Evans. Evans fell to the floor of the van, and observed the defendant spreading gas in the van and igniting it. Evans then jumped out of the van and rolled in the snow to extinguish his burning clothing. Evans had been shot through the right eye, and suffered first and third degree burns on the body.

The defendant's version of the shootings differed in some respects. He stated that he had placed a bag of

marijuana under his coat while in the van, and that he intended to leave with the bag, telling Evans and Ehlers that he was going to get the money from the buyer. When the van stopped, Evans allegedly told the defendant that he was not going anywhere, and reached into his left pocket and pulled out something with a square handle that resembled a gun. The defendant pushed Evans forward, and Evans told Ehlers to grab the defendant. The defendant shot Ehlers, and then shot Evans. He then spread the gasoline, ignited the van, took the other bag of marijuana, and left. Evans stated that he had no gun on the night of the shootings, and that neither he nor Ehlers had threatened the defendant prior to the shootings. No weapon was found in the van after the shootings. Evans advised the police at the hospital that Rodney Stewart had shot him.

Police officers went to Stewart's home shortly after the discovery of the crimes. The defendant was not home at that time, but the defendant's father discovered that his revolver, five shells, and his gasoline can were missing. The defendant's parents brought him to the police station at about 10 p.m. that night, where he was questioned and subsequently confessed to the shootings. Additional facts will be subsequently referred to in connection with the discussion of specific issues.

The defendant lists 11 assignments of error which may be summarized as follows: (1) The Nebraska death penalty statute is unconstitutional under both the federal and Nebraska Constitutions in that capital punishment is cruel and unusual punishment, it does not comply with the standards set forth in Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and fails to provide for a jury determination of mitigating and aggravating circumstances; (2) the aggravating and mitigating circumstances contained in section 29-2523, R. R. S. 1943, are unconstitutionally

vague and indefinite, and were misapplied in this case; (3) the District Court committed reversible error in (a) overruling the defendant's motion to suppress the confessions of the defendant, (b) denying defendant's motion to transfer the case to juvenile court, (c) refusing to accept the defendant's plea of guilty to count I and refusing to dismiss count II of the indictment, (d) admitting into evidence photographs of the deceased, and (e) refusing to instruct the jury on the crime of mansalughter; and (4) that the sentence was excessive. These assignments of error fall into three main groups: (1) Those referring to the validity of the convictions because of alleged errors occurring in pretrial proceedings, and in the trial itself; (2) those referring to the application of the Nebraska death penalty statute in this case; and (3) those challenging the constitutionality of the Nebraska death penalty statute on various grounds.

In the assignments falling in the latter group, the defendant contends that the Nebraska death penalty statute is unconstitutional under both the federal and Nebraska Constitutions for the reasons that capital punishment is cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, and under Article I, section 9, of the Bill of Rights, of the Nebraska Constitution; that it violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in failing to provide for a jury determination of mitigating and aggravating circumstances; and that the aggravating and mitigating circumstances contained in section 29-2523, R. R. S. 1943, are unconstitutionally vague and indefinite. The assignments of error all involve constitutional challenges which have been considered, discussed, and disposed of, contrary to the defendant's contentions, by this court in State v. Rust, *post* p. 528, 250 N. W. 2d 867, and State v. Simants, *post* p. 549, 250 N. W. 2d 881, and therefore need not again be dis-

cussed in this opinion. For the reasons given in those cases, we hold that the defendant's attack on the constitutionality of the Nebraska statute is without merit, and proceed to discuss the defendant's other assignments of error separately, beginning with those regarding the validity of his convictions.

We first consider his claim that the District Court committed reversible error in not suppressing the confessions of the defendant. The relevant facts are that two statements or confessions were given by the defendant to the police following their interrogation of him at the police station. The first was given on the night of the crime after the defendant's parents brought him to the police station; and the second was given in the afternoon of the next day. Only the second statement, exhibit 22, was received in evidence at the trial itself.

The defendant acknowledged in the suppression hearing that prior to giving both statements, he was given the required Miranda warnings, and that his statements were voluntary and not given as the result of any coercion, promises, or inducements. The defendant contended that he was under the influence of marijuana when he gave the first statement, but admitted that he was not under the influence of alcohol or drugs at the time the second statement was given. The latter statement was typed by a police officer as the defendant answered questions and gave his version as to what had transpired. After the statement was typed, the defendant read it, initialed each page, signed it, and indicated that he understood what it contained. The trial court found that the totality of circumstances indicated knowing, voluntary, and intelligent confessions on the part of the defendant.

The defendant contends that his second confession was taken without first notifying his parents, and that it was therefore involuntary and inadmissible. He also relies on the case of State v. Pike, 516 S. W. 2d 505 (Mo.

App., 1974), in support of his proposition that before the confession of a juvenile can be deemed voluntary, the juvenile must be warned that he could be prosecuted as an adult. That case and other Missouri cases do stand for that proposition. See State v. McMillian, 514 S. W. 2d 528 (Mo., 1974). Finally, the defendant argues that his first confession was involuntary because he was under the influence of marijuana at the time he made it.

Three recent Nebraska cases indicate that the defendant's contentions are without merit. State v. McDonald, 195 Neb. 625, 240 N. W. 2d 8 (1976); State v. Lytle, 194 Neb. 353, 231 N. W. 2d 681 (1975); State v. Russell, 194 Neb. 64, 230 N. W. 2d 196 (1975). Those cases follow the well-established rule that a confession is admissible when it is knowingly, intelligently, and voluntarily made; and in all three this court followed a "totality of circumstances" test, under which the age and mental condition of the defendant, the role of the defendant's parents, and other factors are merely circumstances to consider in regard to the question of whether a minor's confession is knowing, intelligent, and voluntary. In each case the court upheld the admission in evidence of the confession of a minor either 16 or 17 years of age. Those cases indicate that there is no requirement in Nebraska that a juvenile must be warned that he can be prosecuted as an adult before his confession can be deemed voluntary, nor that the juvenile's parents be notified prior to taking his statement. In this case, unlike the cases on which the defendant relies, the police officers did not indicate to the defendant that he would be prosecuted as a juvenile, but gave him standard Miranda warnings. The defendant's parents were with him prior to his giving his first statement, and he acknowledged in his second statement that he had spoken to his parents prior to giving that statement. In reviewing the record, our conclusion is that, on the totality of circumstances, the defendant's state-

ments were clearly knowing, voluntary, and intelligent, and the District Court did not commit error in overruling defendant's motion to suppress his confessions, and in admitting the second confession into evidence in the trial.

Defendant next contends that the District Court committed reversible error in denying his motion to transfer the case to Juvenile Court. This motion was filed pursuant to the provisions of section 29-1816, R. R. S. 1943, which provides that a juvenile may move the District Court to waive jurisdiction in his case to the Juvenile Court, and also requires a hearing on the motion. That section also provides: "After considering all the evidence and reasons presented by both parties, pursuant to section 43-202.01, the case shall be transferred unless a sound basis exists for retaining the case," and requires that the court shall set forth findings for the reason for its decision. The trial court in this case did set forth its reasons for retaining jurisdiction of the case, specifically mentioning five factors. Defendant contends that the trial court abused its discretion in not considering all the criteria as set out in section 43-202.01, R. S. Supp., 1974.

Defendant's argument is without merit. In Kent v. United States, 383 U. S. 541, 560, 561, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966), the Supreme Court, in reviewing a District of Columbia statute which permitted juvenile courts to waive jurisdiction over minors to adult criminal courts, stated that the juvenile court must accompany its waiver order with the statement of the reasons or considerations therefore and that such a statement "must set forth the basis for the order with sufficient specificity to permit meaningful review." Also in Breed v. Jones, 421 U. S. 519, 95 S. Ct. 1779, 44 L. Ed. 2d 346 (1975), the court stated: "However, the Court has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court."

Thus the Supreme Court has never established standards which the states must apply in determining whether a person should be tried as a juvenile or as an adult. It has only held that a hearing must be had; that the reasons for the decision must be given with sufficient specificity to permit meaningful review; and that a person cannot be tried in both juvenile and adult court. It is to be noted that the Nebraska statute provides for a hearing, sets forth relevant considerations, and provides for an ultimate judicial determination on the issue of transfer. Nebraska law is clear that juvenile courts do not have the sole and the exclusive jurisdiction of children under 18 years of age who have violated law. State v. Grayer, 191 Neb. 523, 215 N. W. 2d 859 (1974). See, also, § 43-202(3)(b), R. S. Supp., 1974; and State v. Lytle, *supra*. The question presented, therefore, is whether the trial court complied with the statutory scheme, set forth above, and whether or not it abused its discretion.

The written findings of the trial court in regard to waiver of jurisdiction to the juvenile court refer to five of the eight considerations listed in section 43-202.01, R. S. Supp., 1974. That section requires the *consideration* of the enumerated items, but nowhere does the statute require that the court refer to all eight considerations in its findings. Section 43-202.02, R. S. Supp., 1974, only requires that the court "set forth findings for the reason for its decision." The defendant contends that the trial court did not consider all the items listed in section 43-202.01, R. S. Supp., 1974, because its written order does not refer to all those items.

While it would have been preferable for the trial court to refer to all the considerations set forth in section 43-202.01, R. S. Supp., 1974, in its order, the statute in question does not require the court to do so. In this case, the court did make a separate statement of its findings which appears to comply with the statute and which provides sufficient specificity to permit mean-

ingful review by this court. We conclude that the trial court substantially complied with the statutory scheme set forth above, and that it did not abuse its discretion in concluding from the evidence that a "sound basis exists for retaining this case."

We now consider defendant's claim that the court erred in refusing to accept defendant's plea of guilty to first-degree murder, as charged in count I of the indictment, and in refusing to dismiss count II of the indictment. The facts underlying this assignment of error are that on July 21, 1975, the county attorney moved to dismiss count II of the indictment (shooting with intent to kill, wound, or maim) for the reason that a plea bargain had been reached whereby the defendant would plead guilty to count I (first-degree murder). Both the county attorney and the defendant's attorney supported this motion. The trial court refused to sustain the motion for a number of reasons, including the following: (1) The plea would not save time or money because defendant could challenge the plea in subsequent proceedings; (2) a court should only rarely accept a plea of guilty in a first-degree murder case; (3) the jury could find the defendant not guilty; (4) a guilty plea would not save time because a full trial is required to determine whether the death penalty should be imposed; and (5) that the court had doubts whether the defendant could voluntarily, intelligently, and knowingly tender a plea of guilty. On July 28, 1975, the defendant and counsel for both sides again appeared before the court and again tendered a plea of guilty to the murder charge. After further discussion, the court again refused to accept the plea bargain, essentially for the same reasons previously referred to. The court further stated: "I cannot see how this Court could commit anything but error by entering into a plea bargain. And that's what it is, you can call it what you will. It's a plea bargain in which the Defendant and his counsel, in conjunction with the deputy

county attorney, are entering into a deal whereby they can fix the penalty and take all discretion from the court." The court further expressed the fear that if it accepted the plea a higher court would reverse its acceptance of the plea, and the case would come back "after all the evidence has been dissipated or gone."

Although the issue raised in this assignment of error involves two aspects, the first being whether a trial court must accept a guilty plea because a defendant wishes to so plead, and the second being whether the court must dismiss a second count in an indictment under a proposed plea bargain, these issues are interrelated and will be discussed together.

The law is well established that a criminal defendant has no absolute right to have a guilty plea accepted and that a trial court may reject a plea in the exercise of sound discretion. Santobello v. New York, 404 U. S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971); Lynch v. Overholser, 369 U. S. 705, 719, 82 S. Ct. 1063, 8 L. Ed. 2d 211 (1962). See, also, North Carolina v. Alford, 400 U. S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). The defendant admits in his brief that he had no absolute constitutional right to plead guilty, but he nevertheless argues that since he was not allowed to plead guilty to count I, his conviction should be reversed. While it is generally true, as stated above, that a court may reject a plea of guilty in the exercise of sound judicial discretion, that is not to say that there is *no* limit on the trial court's right to refuse to accept a constitutionally valid guilty plea. See, for example, United States v. Ammidown, 497 F. 2d 615 (D. D.C., 1973); United States v. Maggio, 514 F. 2d 80 (5th Cir., 1975), cert. den. 423 U. S. 1032. We do not believe that it is necessary at this time to discuss exhaustively the scope of the discretion of a trial court to refuse to accept a guilty plea tendered by a defendant. Suffice it to say that under the facts of this case, although we may not agree with all the reasons stated

by the trial court in refusing to accept Stewart's guilty plea, and although some of the court's reasons may be a matter of dispute, we cannot say that the trial court abused its discretion in so doing.

The problem arising from the motion of the county attorney to dismiss count II has been disposed of in the case of State v. Sanchell, 191 Neb. 505, 216 N. W. 2d 504 (1974), where we held that before a county attory can dismiss an information, it is first necessary that he obtain approval of the court to do so.

In State v. Evans, 194 Neb. 559, 234 N. W. 2d 199 (1975), this court discussed and quoted extensively from sections 1.8 and 3.3 of the ABA Standards Relating to Pleas of Guilty. Section 3.3(c) of those Standards provides as follows: "When a plea of guilty or nolo contendere is tendered or received as a result of a prior plea agreement, the trial judge should give the agreement due consideration, but notwithstanding its existence he should reach an independent decision on whether to grant charge or sentence concessions under the principles set forth in section 1.8." In the above opinion this court stated: "In the area of sentencing the defendant should be fully informed that the trial judge will not be bound by any agreement. He should understand the recommendation is no more than a recommendation to be considered under the principles set out in section 1.8 of the ABA Standards Relating to Pleas of Guilty." It is clear that in deciding whether or not to accept a plea bargain arrangement involving guilty pleas, the trial court is afforded a large measure of discretion, although such discretion is not unlimited. United States v. Cowan, 524 F. 2d 504 (5th Cir., 1975). We conclude, therefore, that the trial court did not commit reversible error in not honoring the plea bargain agreement between the county attorney and defendant's counsel, and in refusing to accept defendant's plea of guilty to the charge of murder and refusing to grant the motion of the county attorney to dismiss

count II of the indictment pursuant to the terms of the plea bargain.

During the course of the trial, two gruesome photographs of the deceased, Thomas Ehlers, being close-up shots of his charred body taken at the morgue, were received in evidence as exhibits 15 and 16. Defendant alleges prejudicial error on the part of the trial court in so doing. The general rule is that admissibility of photographs of a gruesome nature rests largely in the discretion of the trial court. State v. Wilbur, 186 Neb. 306, 182 N. W. 2d 906 (1971); State v. Robinson, 185 Neb. 64, 173 N. W. 2d 443 (1970).

The admission of the photographs in evidence in this case was for the purpose of identification, to show that the body on which the autopsy was performed was the same body found in the van. In admitting the exhibits into evidence, the court stated that grotesqueness alone was not enough to render the photographs inadmissible; and it cautioned the jury in its instructions to consider them solely for the limited purpose of such identification.

Although it is true that the probative value of such evidence should be weighed against its possible prejudicial effect before it is admitted, if a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if it is gruesome. State v. Robinson, *supra*; Washington v. State, 160 Neb. 385, 70 N. W. 2d 378 (1955). Since the purpose of the admission was for identification of the body, we believe the photographs in question were properly admissible for that purpose under the sound discretion afforded the trial court. State v. Blackwell, 184 Neb. 121, 165 N. W. 2d 730 (1969). In any event, in view of the overwhelming evidence against the defendant adduced at the trial, including his own confession and description of the shooting and killing of Ehlers, the admission of the photographs in question was, at most, harmless

error under section 29-2308, R. R. S. 1943. Under either approach, the admission of the photographs in this case was not reversible error.

Finally, the defendant contends that the District Court committed reversible error in refusing to instruct the jury on the crime of manslaughter. The defendant offered a proposed instruction which included an instruction on manslaughter. The court refused to give this instruction, finding that there was not "one iota" of evidence that there was a sudden quarrel, or that the shootings were unintentional. The court did give an instruction on murder in the second degree, and also gave an instruction as to the defendant's theory that his acts were justified and in self-defense.

The crime of mansalughter is defined as follows: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter; * * *" § 28-403, R. R. S. 1943. The following rules of law apply. It is the duty of the court, in a homocide case, to instruct only on those degrees of homicide as find support in the evidence. State v. Worley, 178 Neb. 232, 132 N. W. 2d 764 (1965). Where the evidence is such that different conclusions may properly be drawn therefrom as to the degree of the crime, it is the duty of the trial court to instruct the jury on such degrees of homicide as find support in the evidence. Washington v. State, supra; Clown Horse v. State, 170 Neb. 336, 102 N. W. 2d 625 (1960); Denison v. State, 117 Neb. 601, 221 N. W. 683 (1928). The court is only required in instructions to state the law applicable to the facts proved and those which the evidence tends to prove. Veneziano v. State, 139 Neb. 526, 297 N. W. 920 (1941). It is the duty of the court upon request of the accused to instruct the jury upon the theory of the case, if there is evidence to support it. State v. Matejka, 186 Neb. 454, 183 N. W. 2d 917 (1971).

Under these principles, the question arises whether in this case there is any evidence tending to support or prove manslaughter. The case which most closely resembles this case is Veneziano v. State, *supra*. In that case there was testimony that at the time of a shooting the deceased threatened to kill the defendant and that he had his hand in his pocket, which purportedly had in it a gun. The defendant contended that he killed the deceased in order to save his own life. The court found the evidence insufficient to disclose a sudden quarrel which would meet the statutory conception of manslaughter, and found that the evidence disclosed that the shooting was unprovoked. The court concluded that the deceased never displayed a gun at the time, nor said anything to warrant any one in believing that he had a gun.

In the instant case, the defendant testified that Evans pulled something, which resembled a gun, from his pocket prior to the shootings. Evans denied doing this, stated that the shootings were unprovoked, and claimed that no quarrel precipitated the shootings. No gun was found on Evans, Ehlers, or in the van. Even the defendant's testimony does not indicate that a quarrel took place prior to the shootings. Rather, the defendant stated that he was about to leave the van with the marijuana, that Evans told him he wasn't going anywhere, and that Evans then pulled something from his pocket which resembled a gun. The defendant stated that he then shoved Evans, who told Ehlers to get the defendant. The defendant then shot both victims.

Even if the facts described above could be viewed as a "quarrel," the trial court was undoubtedly correct in stating that the evidence did not really show facts constituting manslaughter. This view is supported by the fact that the jury was instructed on murder in the second degree, yet returned a verdict of guilty of premeditated murder. In view of alleged prior threats

by the victims, the defendant's version of the events is more supportive of a claim of self-defense, on which the jury *was* instructed, than it was a description of facts constituting the crime of manslaughter. Further, we note that the defendant did not claim that Ehlers did anything, or said anything, at the time the van was stopped, and also that the defendant was charged with the murder of Ehlers, not Evans. The assignment is without merit.

After carefully examining the defendant's alleged assignments of errors relating to the validity of his conviction, as discussed above, we conclude that no reversible error was committed by the trial court, and that defendant was properly convicted of the crimes with which he was charged.

We turn now to a consideration of whether the death sentence imposed upon the defendant by the court was a proper sentence under the facts and circumstances of this case.

Following the issuance of the opinion of the United States Supreme Court in Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the Nebraska Legislature, in an effort to conform with the requirements for validity of death penalty statutes set forth in Furman, revised Nebraska's statute, and in 1973 enacted L.B. 268, R. R. S. 1943, which now appears as sections 29-2519 to 29-2546, R. R. S. 1943. Section 29-2520 of the new Nebraska statute provides that whenever any person is found guilty of a violation of section 28-401, R. R. S. 1943, which defines murder in the first degree, the District Court shall within 7 days fix a date for hearing on the determination of the sentence to be imposed and further provides that the determination shall be made by the judge who presides at the trial or who accepted the plea of guilty; or a panel of three District Judges including the judge who presided or accepted the plea; or a panel of three District Judges named by the Chief Justice of the Supreme

Court. In the instant case the hearing was held and the determination made by the judge who presided at the trial, rather than a panel of three judges. Section 29-2521, R. R. S. 1943, provides that at the hearing evidence may be presented as to any matter that the court deems relevant to the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances set forth in section 29-2523, R. R. S. 1943. However, the sections we deem most material for a determination of the issue before us are sections 29-2522 and 29-2523 which we set out verbatim below: Section 29-2522, R. R. S. 1943, provides: "After hearing all of the evidence and arguments in the sentencing proceedings, the judge or judges shall fix the sentence at either death or life imprisonment, but such determination shall be based upon the following considerations: (1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death; or (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances.

"In each case in which the court imposes the death sentence, the determination of the court shall be in writing and shall be supported by written findings of fact based upon the records of the trial and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination."

Section 29-2523, R. R. S. 1943, provides: "The aggravating and mitigating circumstances referred to in sections 29-2521 and 29-2522 shall be as follows:

"(1)  Aggravating Circumstances:

"(a)  The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity;

"(b)  The murder was committed in an apparent ef-

fort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime;

"(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

"(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;

"(e) At the time the murder was committed, the offender also committed another murder;

"(f) The offender knowingly created a great risk of death to at least several persons;

"(g) The victim was a law enforcement officer or a public servant having custody of the offender or another; or

"(h) The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws.

"(2) Mitigating Circumstances:

"(a) The offender has no significant history of prior criminal activity;

"(b) The offender acted under unusual pressures or influences or under the domination of another person;

"(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;

"(d) The age of the defendant at the time of the crime;

"(e) The offender was an accomplice in the crime committed by another person and his participation was relatively minor;

"(f) The victim was a participant in the defendant's conduct or consented to the act; or

"(g) At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of

law was impaired as a result of mental illness, mental defect, or intoxication."

The State of Florida has adopted a statute which is very similar to the Nebraska statute, at least so far as the application of aggravating and mitigating circumstances is concerned in the determination of whether the death penalty should be applied. See West's F. S. A., § 921.141. The Supreme Court of Florida has had occasion to interpret its statute as to the manner it is to be applied. In State v. Dixon, 283 So. 2d 1 (Fla., 1973), that court stated: "It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present. Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in Furman v. Georgia, supra, can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all."

In Alvord v. Florida, 322 So. 2d 533 (Fla., 1975), the Supreme Court of Florida further elaborated on State v. Dixon, supra, stating: "There is no way that the Legislature could program a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors in each case. See State v. Dixon, supra. The law does not require that capital punishment be imposed in every conviction in which a

particular state of facts occur. The statute properly allows some discretion, but requires that this discretion be reasonable and controlled. No defendant can be sentenced to capital punishment unless the aggravating factors outweigh the mitigating factors. However, this does not mean that in every instance under a set state of facts the defendant must suffer capital punishment.

"The statute contemplates that the trial jury, the trial judge and this Court will exercise reasoned judgment as to what factual situations require the imposition of death and which factual situations can be satisfied by life imprisonment in light of the totality of the circumstances present in the evidence. Certain factual situations may warrant the infliction of capital punishment, but, nevertheless, would not prevent either the trial jury, the trial judge, or this Court from exercising reasoned judgment in reducing the sentence to life imprisonment. Such an exercise of mercy on behalf of the defendant in one case does not prevent the imposition of death by capital punishment in the other case." We believe the approach and reasoning of the Florida Supreme Court is correct, and adopt it in this case.

We also note that the Nebraska statute specifically provides: "That the rational imposition of the death sentence requires the establishment of specific legislative *guidelines* to be applied in individual cases by the court." (Emphasis supplied.) § 29-2519, R. R. S. 1943. The Nebraska statute specifically requires that the judge or judges in determining to fix the sentence at either death or life imprisonment shall weigh the aggravating and mitigating circumstances. §§ 29-2519 and 29-2522, R. R. S. 1943. The word "weigh," as defined in Webster's Third New International Dictionary (Unabr.), p. 2593, means "To consider or examine for the purpose of forming an opinion or coming to a conclusion: consider carefully, esp. by balancing one quality, aspect, or thing against another in order to make a choice, decision, or judgment."

Finally, with reference to the question of what burden of proof must be met before an aggravating circumstance is proven to exist, we have this day disposed of that issue in State v. Simants, *post* p. 549, 250 N. W. 2d 881, where we adopted the rule that the facts on which the finding of an aggravating circumstance referred to in the Nebraska act is based must be proved beyond a reasonable doubt. To the same effect, see, Alford v. State, 307 So. 2d 433, 444 (Fla., 1975).

With the above as a backdrop, particularly keeping in mind the requirement that the existence of an aggravating circumstance must be established by proof beyond a reasonable doubt, let us now examine the findings and conclusions of the trial judge, who, sitting alone, conducted the section 29-2520, R. R. S. 1943, hearing, and concluded that the death penalty should be imposed upon the defendant in this case.

We first consider the aggravating circumstances set out in section 29-2523(1), R. R. S. 1943. It is not clear from the written findings of the judge whether he applied (1)(a) of the above section. The record is clear that the defendant had no prior criminal record whatsoever, as the trial court acknowledged, but in its comments on the circumstances, the court referred to the defendant's attempt to kill Evans, evidently considering the fact relevant in regard to the applicability of that subsection. If the trial court did apply this circumstance, it would clearly be erroneous. We have this day held in State v. Rust, *post,* p. 528, 250 N. W. 2d 867, and State v. Holtan, *post,* p. 544, 250 N. W. 2d 876, that (1)(a) should be applied only to criminal activity conducted prior to the events out of which the charge of murder arose. The killing of Ehlers and the wounding of Evans occurred at the same time and arose out of the same events. Subsection (1)(a) clearly is not applicable in this case.

The trial judge found that (1)(b) was applicable, stating that the murder was committed in an apparent

effort to conceal the commission of the crimes and to conceal the identity of the defendant as the perpetrator. In his confession introduced into evidence as exhibit 22, the defendant stated: "\* \* \* I planned on ripping them off and was only taking the gun along with me in case I needed it for protection. I was just taking the gas along in case I had to use the gun on them then I would use the gasoline to set the truck on fire to cover up me shooting them if this came down that way." In the same statement he was asked why he took the gasoline along with him on the buy, and replied: "Because I was going to use it to set the truck on fire to cover up if I had to shoot them, to make it look like an accident, or just a fire." It is clear that the defendant had a dual motivation in what he did, and his purpose was both to conceal the theft of the marijuana, and also his identity as the thief. Even without considering what additional motive he may have had in killing Ehlers, it is clear that the trial court was correct in applying circumstance (1)(b) to this case.

The trial judge also found that (1)(c) was applicable because the murder was committed for the purpose of gaining possession of marijuana from the deceased and Evans, and hence was for "pecuniary gain." We have this day held in State v. Rust, *post,* p. 528, 250 N. W. 2d 867, that subsection (1)(c) applies only to the hired gun, the hirers of the gun, and to murder motivated by a desire for pecuniary gain as in the case of the murder of an insured by the beneficiary, or the murder of a testator by a legatee or devisee, etc. It would clearly not apply where,. as in the instant case, the murder itself was not primarily committed to attain the pecuniary gain, but was intended to be used, if necessary, to cover up the commission of the crime or his identity as the perpetrator.

We also note that were subsection (1)(c) to be construed to apply to murder committed in the course of a

robbery, it would appear that defendants who commit such murders would, from the outset, have two aggravating circumstances applied to them, (1)(b) and (1)(c); whereas in the case of a premeditated murder, neither circumstance would apply. We do not believe the Legislature intended to treat persons who commit murder in the course of a robbery more harshly than those who commit premeditated murder. We also find that subsections (1)(b) and (1)(c) are separate and distinct circumstances and should be construed so as not to overlap. Subsection (1)(c) does not apply to the facts of this case.

The trial judge also found that subsection (1)(d) also applied and that the murder was especially heinous, atrocious, cruel, and manifested exceptional depravity by ordinary standards of morality and intelligence. We have discussed and defined the meaning of this circumstance in State v. Simants, *post,* p. 549, 250 N. W. 2d 881, and in State v. Rust, *post,* p. 528, 250 N. W. 2d 867, and shall not repeat that discussion here. Suffice it to say, that although all murders may be characterized as "heinous," by the use of the word "especially" in the subsection under consideration, our Legislature intended something more than the fact that there had been a murder. In State v. Dixon, 283 So. 2d 1 (Fla., 1973), the Supreme Court of Florida defined the term "heinous, atrocious, or cruel," as set out in its comparable statute, to be directed at the conscienceless or pitiless crime which is unnecessarily torturous to the victim. We agree with this definition as to the words referred to. The Nebraska Legislature has, however, added the words "* * * or manifested exceptional depravity by ordinary standards of morality and intelligence." In State v. Simants, *post,* p. 549, 250 N. W. 2d 881, we defined the additional words quoted above as applicable "only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence." The standard

encompasses acts which are totally and senselessly bereft of any regard for human life.

We must, therefore, determine whether under the evidence in the record the murder of Ehlers was a conscienceless or pitiless crime which was unnecessarily torturous to the victim, and also whether the murder exhibited depravity to such an extent to obviously offend all standards of morality and intelligence. In this case, the medical testimony is uncontradicted that Ehlers death was instantaneous, by reason of a gun shot wound to his head; and that he was not tortured. However, the fact that the defendant thereafter set fire to the van for purposes previously stated in this opinion, resulting in the burning of Ehlers body, was indeed gruesome and could be interpreted as manifesting exceptional depravity. However, we think it is clear from the confession of the defendant, that his setting fire to the van was for the purpose of concealing the commission of the crimes or the identity of the perpetrator, and not for the purpose of causing further harm to the victims, who the defendant thought were dead. Under this construction of the facts, it is possible to conclude that in igniting the van, the defendant did not exhibit "exceptional depravity," particularly where the evidence indicates that death was instantaneous and the victim was not tortured. In our opinion (1)(d) was not proved beyond a reasonable doubt, and should not be applied.

The trial judge apparently applied (1)(e) in this case. This was clearly error, for by its terms that subsection is to apply only when the defendant committed another murder. Here the defendant did not commit another murder, but only attempted to commit one. The language is clear, and we hold that (1)(e) is not applicable in this case.

The trial judge also found that aggravating circumstance (1)(f) did exist, stating: "The defendant knowingly created a great risk of death to Daniel Evans as well as having accomplished the murder of Thomas

Ehlers." In State v. Simants, *post*, p. 549, 250 N. W. 2d 881, in considering the above subsection, we stated: "We interpret it to cover those situations where the act of the defendant jeopardizes the lives of more than two other persons, such as the use of bombs or explosive devices, the indiscriminate shooting into groups, or at a number of individuals, or other like situations." Subsection (1)(f) is inapplicable to this case.

Finally, in its written order and findings, the trial judge did not apply, or for that matter even discuss, the application of aggravating circumstances (1)(g) and (1)(h), obviously considering them not to be applicable.

We now consider the mitigating circumstances as set out in subsection (2) of section 29-2523, R. R. S. 1943. In his written findings, the trial judge applied no mitigating circumstance other than (2)(a) which was clearly applicable in view of the fact that the defendant had no criminal record, nor significant history of prior criminal activity. We also agree with the trial court's conclusion that there is no evidence in the record to support a finding that (2)(b), (c), (e), (f), or (g), are applicable.

However we disagree with the conclusion of the trial court that (2)(d), which lists as a mitigating circumstance "the age of the defendant at the time of the crime" should not apply. In discussing the application of this circumstance in his written findings, the trial judge discusses the growing tendency of persons under 17 years of age to commit crimes, observed that he had noticed the calmness and deliberateness with which the defendant conducted himself in the courtroom, referred to the defendant's cool and deliberate planning of the murder and its execution, and concluded with the statement: "While the Court fully considers the age by years of the Defendant the Court is impelled to determine that age cannot *excuse* heartless, diabolical conduct." (Emphasis supplied.) The issue is not whether his age "excuses" the murder. Obviously it does not,

and defendant has been convicted of premeditated murder. Rather the issue is whether in the determination of the application of the death penalty, the mitigating factor of the defendant's youthful age should not be considered along with the other aggravating and mitigating factors to determine whether he should be put to death. The statute mandates consideration of this mitigating circumstance. Are we to say that because of the increase of juvenile crime, every 16-year-old person who has been found guilty of murder is not to have his age considered in the weighing and balancing of the aggravating and mitigating circumstances? We believe not. The statute does not set a definite age as a cutoff point for this purpose, but we believe that a person 16 years of age should receive the benefit of this circumstance.

In this connection we note that section 210.6 of the American Law Institute's Model Penal Code specifically provides that when a defendant is found guilty of murder the court shall impose sentence for a felony of the first degree, rather than the death penalty, if it is satisfied that "* * * (d) the defendant was under 18 years of age at the time of the commission of the crime; * * *." To the same effect see section 3603(a) of the Study Draft of a New Federal Criminal Code, by the National Commission on Reform of Federal Criminal Laws (1970). We do not adopt the arbitrary age as determinative of the application of that mitigating circumstance, but merely point out that there is reputable authority espousing an even higher age than in the instant case. Stewart's actions on the night of January 25, 1975, are in no way to be considered as a defense to the crime of murder of which he has been convicted, but they do not preclude consideration of his youthful age at the time of the shooting as a mitigating circumstance in this case under subsection (2)(d), and we so hold.

In summary, therefore, it appears that of the eight

aggravating circumstances referred to in section 29-2523, R. R. S. 1943, only one, (1)(b), or at the very most two, if we were to consider the application of (1) (d), are applicable; whereas of the seven mitigating circumstances, (2)(a) and (2)(d) are applicable.

Section 29-2522, R. R. S. 1943, specifically provides that in determining whether the sentence shall be death or life imprisonment, the judge or judges shall consider, in addition to whether sufficient aggravating circumstances exist to justify the imposition of a sentence of death, "whether sufficient mitigating circumstances exist *which approach or exceed the weight given to the aggravating circumstances.*" (Emphasis supplied.) Under our statute, a sentencing judge may properly impose a sentence of life imprisonment, rather than a sentence of death, where the mitigating factors only approach or equal the weight given to the aggravating circumstances. They need not "outweigh" the aggravating circumstances.

That situation exists in this case. Here the defendant was not "crime-wise" in the sense that previous conflicts with the law had made him a sophisticated criminal. He had no prior criminal record and he had never been arrested. He resided with his parents, and there is nothing in the evidence to indicate that this was other than a stable family. The school records introduced in evidence indicate that his school grades were average and improving at the time of the crime. His conduct and character were favorably spoken of by at least some of his teachers and counselors. He had no particular disciplinary problem, although it is true that he was once suspended briefly from school for possession of a marijuana cigarette.

After weighing the aggravating and mitigating circumstances in this case we conclude that the defendant's age at the time of the crime and the absence of any significant criminal record mitigate strongly against the imposition of the death penalty upon Rodney Stew-

art; and that the public will be served and justice done by sentencing him to a term of life imprisonment. We modify the sentence of the court accordingly.

In view of our decision to reduce the defendant's sentence to life imprisonment upon a consideration of aggravating and mitigating circumstances, it is unnecessary for us to discuss defendant's assignment of error that the sentence of the defendant to death was excessive and should be reduced to life imprisonment pursuant to the authority of section 29-2308, R. R. S. 1943. In this connection, we point out that section 29-2524, R. R. S. 1943, specifically provides that: "Nothing in sections 24-342, 28-401, 28-417, and 29-2519 to 29-2546 shall be in any way deemed to repeal or limit existing procedures for automatic review of capital cases, nor shall it in any way limit the right of the Supreme Court to reduce the sentence of death to a sentence of life imprisonment *in accordance with the provisions of section 29-2308*, nor shall it limit the right of the Board of Pardons of commute any sentence of death to a sentence of life imprisonment." (Emphasis supplied.) It appears clear, therefore, that by express language of the Legislature, the remedy provided by section 29-2308, R. R. S. 1943, is also available and may be employed where the court determines that a sentence is excessive and should be reduced, and that the provisions of sections 29-2519 to 29-2523, R. R. S. 1943, are not exclusive.

We add that we have compared the cases of State v. Rust, *post*, p. 528, 250 N. W. 2d 867, State v. Simants, *post*, p. 549, 250 N. W. 2d 881, and State v. Holtan, *post*, p. 544, 250 N. W. 2d 876, with this case, and with each other and incorporate herein the pertinent rules announced therein.

For the reasons heretofore stated in this opinion, we affirm the conviction of the defendant for the offenses charged in the indictment, but modify the sentences im-

posed upon him by reducing his sentence to death under count I to a sentence of life imprisonment.

AFFIRMED AS MODIFIED.