STATE OF NEBRASKA, APPELLEE, V. SEAN PHINNEY, APPELLANT.
455 N.W.2d 795

Filed May 25, 1990. No. 89-759.

Thomas L. Spinar for appellant.

Robert M. Spire, Attorney General, and Mark D. Starr for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Following a conviction for second degree murder upon a plea of no contest and a sentence to a term of imprisonment for 30

years, the defendant, Sean Phinney, a 15-year-old juvenile, appeals from his conviction, his sentence, and an earlier order denying his motion to remove these proceedings to the juvenile court. The denial of removal under Neb. Rev. Stat. § 43-276 (Reissue 1988) constitutes his sole assignment of error.

The defendant was born on August 30, 1973. On January 20, 1989, after a fight with his mother, Linda Phinney, he shot and killed her. He was originally charged with first degree murder and use of a firearm to commit a felony. On March 7, 1989, defendant filed a motion to remove the proceedings to juvenile court.

The motion to remove was denied. Thereafter a plea agreement was entered into between the State and the defendant whereby an amended information charging only second degree murder was filed.

At the hearing on the motion to remove, a written stipulation was entered into between the State and counsel for the defendant. The parties stipulated that the State would be able to call "certain witnesses with whom the defense is familiar," who would testify in essence that (1) on January 20, 1989, Linda Phinney was shot to death in her home in Wilber, Nebraska, (2) the defendant committed the act which caused Linda Phinney's death, and (3) "a letter found at the scene which the State believes to be written by Defendant, would indicate that the Defendant had thought about committing the act of violence for a period of time before the act was committed."

The letter referred to is found as the last page of the presentence investigation report. It states, "Here is how it happen[.] Mom and I had a fight and I went out for a hour came in the house and she was sleeping so I loaded the 22 rifle and went in her room and put the gun to her head and pull the chirger[.]" A police report written by Sgt. G.L. Moss relates that the victim's body was found on the floor of the kitchen.

The defendant called six witnesses. Steven Wallick, a guidance counselor at the school defendant attended, testified that defendant, held back in the eighth grade, was approximately a year behind his age group in maturity. The witness observed that the last couple of days before January 20, 1989, defendant seemed a little more withdrawn.

Two women neighbors, who described themselves as friends of the defendant and his mother, Linda, testified that Sean was upset over the separation of his mother and adoptive father and that he and his mother were constantly fighting with each other, particularly over her habit of spending weekends in Lincoln with her boyfriend. There was also testimony that the defendant seldom got angry and that, if he did, he was never violent.

Defendant's grandmother, who was Linda's mother, testified that she had always had a good relationship with both her daughter and grandson. She expressed the belief that Linda was partly responsible for what had happened because of Linda's going to Lincoln on weekends and neglecting to discuss the matter with Sean.

Sean's adoptive father told about what he described as the "consistent" arguments between the defendant and his mother. He related how Sean had told him that he felt he could not trust his mother. He knew that Linda had slapped or struck Sean on occasions. Mr. Phinney felt from his discussions with Sean that Sean now missed his mother.

The principal witness for the defendant was Dr. John Riedler, a psychiatrist who first met the defendant on January 22, 1989, at St. Joseph Center for Mental Health. He described the defendant at that time as "a very agitated and dysphoric, upset young person, who had great difficulty concentrating. His attention span was very scarred. . . . He was having acute adjustment reactions at that point." Dr. Riedler treated defendant from January 22 to March 7, 1989, when defendant was discharged from the hospital.

Dr. Riedler received information that defendant "was suffering from increasing dysphoria and concentration problems and increasing paranoia and difficulty with his reality and irritation for several months before [the death of his mother]." Dysphoria is a state of emotional pain—an inability to bring oneself to a state of calmness or relaxation. In the months leading up to January 20, 1989, defendant "was becoming more aggravated and more paranoid, and less able to focus his attention, more uncomfortable, more anxious."

In Dr. Riedler's opinion, on January 20, 1989, defendant

was suffering from increasing anxiety, exhibited self anger and feelings of paranoia that mounted and reached a peak in the morning in question, and that he was in a state that would be characterized as something like heat of passion or a very emotional state, but that he was not insane.

Dr. Riedler testified that he felt defendant entered the state he was in when his mother threatened to hit or slap him during the argument they were having. According to Dr. Riedler, it was not until after defendant shot his mother, left the house with the car keys in his hand, and had to make a decision of where to drive that rational thought returned to him. When asked if defendant, during the period of time that he was in the state he was in, was capable of rational thought, Dr. Riedler responded that defendant was capable of it but that he did not think that defendant did so.

Dr. Riedler diagnosed defendant as suffering from dysthymia (a condition of depression; an underlying paranoid style that is always irritable, always a little bit down in the dumps) and major depression with a paranoid psychotic component. He did not feel that defendant's condition was permanent, felt that it could be treated, and felt that defendant needed "quite a bit more treatment." According to Dr. Riedler, defendant is not well socialized, so "he needs to be retrained in his social skills in a very consistent, structured manner" before he could or should return to society. Additionally, due to the underlying dysthymia, when defendant is 17 or 18 he will require some therapy. Defendant will also have to work through his grief. "If he solidifies his character structure, he will definitely have trouble with serious depression and suicidal self-destructiveness. . . . He also needs to settle his score and pay his price."

When asked what environment would be the most appropriate or the best in which to conduct the retraining, Dr. Riedler opined that defendant should be placed in the Youth Development Center-Kearney until he is 19 years old. According to Dr. Riedler, in defendant's present condition his nervous system is wide open and many different things could be programmed into his future actions, and if he is put in with a lot of hardened criminals, "you're likely to get that sort of result."

Additionally, defendant is likely to be abused if he is put in with adult criminals, and "this will further his self-destructiveness. It will sort of like be going in the wrong direction." Dr. Riedler was also of the opinion that placement under the care of the Nebraska Department of Social Services for some kind of protective placement would also be bad because defendant "has unfinished business that he is aware of. He has the work that needs to be done with the structuring of his personality and socialization." Due to the inability of the Department of Social Services to provide what he needs, defendant would be no better off if placed with social services than he would be in the penitentiary. According to Dr. Riedler,

> if you put him in a structured facility of a residential nature, that has structured rules, and expectations, where he could learn to socialize with peers and adult authorities in a healthy manner, and he was put in the same kind of — not just counseling, but therapy to work through the grief and to develop out of the dysthymia, as a condition of his life, he would — he has every possibility of turning into a healthy, well-functioning adult.

In Dr. Riedler's opinion, placement in Kearney is defendant's best chance to be returned to society as a healthy, functioning adult.

Dr. Riedler further stated that if defendant were placed in the penitentiary, "being young and not that big and already suffering from self-destructiveness, and easily becoming paranoid, being in with hardened criminals would go a long way in preventing him from ever working through the difficulties that have put us in the situation of being here in this Court today." Although defendant could be returned as a healthy, productive member of society if he were placed in the penitentiary, it would be much more difficult than if things were done differently. In Dr. Riedler's opinion, it is much more likely that defendant would be returned as a healthy, productive member of society if placed in the development center in Kearney. This is also the opinion of another psychiatrist consulted by Dr. Riedler.

Dr. Riedler felt that if defendant were successfully treated at Kearney, he could be released back into society without posing a

danger to society. Additionally, at Kearney it would not be unusual for defendant to have a board-certified psychiatrist examine him on a periodic basis to see if he were making any progress or if there were some need to reevaluate the situation.

On cross-examination, Dr. Riedler admitted that it is possible that defendant will still have problems after he is 19 years old.

When questioned about the effect knowledge of a note indicating that defendant thought about committing a crime of murder several hours before committing it would have on his opinion, Dr. Riedler testified in essence that it would not change his opinion that defendant actually entered the state of passion, but that it would raise a question about periods of lucidity.

The State called only one witness, Randy Walters of the Saline County sheriff's office. Walters interviewed nine of defendant's teachers. Defendant's football coach told Walters that defendant "was the type of person that if put into a leadership position, he knew that it would be handled."

As to any juvenile (a person under the age of 18, see Neb. Rev. Stat. § 43-245 (Reissue 1988)) who has committed an act which would constitute a felony, the juvenile court shall have concurrent original jurisdiction with the district court. Neb. Rev. Stat. § 43-247 (Reissue 1988). The juvenile may move the district court where the felony is charged to waive jurisdiction to the juvenile court for further proceedings under the Nebraska Juvenile Code. In deciding the motion the district court shall, after considering the evidence and the reasons presented by the parties and the criteria set forth in § 43-276, transfer the case unless a sound basis exists for retaining jurisdiction. See, Neb. Rev. Stat. §§ 43-261 (Reissue 1988) and 29-1816 (Reissue 1989).

The criteria to be considered in deciding upon the motion for transfer to the juvenile court include: (1) the type of treatment the juvenile would be amenable to; (2) whether there is evidence that the alleged offense included violence or was committed in an aggressive and premeditated manner; (3) the motivation for the commission of the offense; (4) the age of the juvenile and the ages and circumstances of any others involved in the offense; (5) the previous history of the juvenile, including his or her conviction of any previous offenses; (6) the sophistication

and maturity of the juvenile and whether he or she has had previous contact with law enforcement agencies and courts; (7) whether there are facilities particularly available to the juvenile court for treatment and rehabilitation of the juvenile; (8) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in custody or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; and (9) such other matters as may be deemed relevant. § 43-276.

In ruling on a motion for removal, the district court "shall set forth findings for the reason for its decision, which shall not be a final order for the purpose of enabling an appeal." § 43-261.

This court has stated that in deciding whether to grant the requested waiver and to transfer the proceedings to juvenile court, the court having jurisdiction over a pending criminal prosecution must carefully consider the juvenile's request in the light of the criteria or factors set forth in § 43-276. *State v. Thieszen*, 232 Neb. 952, 442 N.W.2d 887 (1989). The court may properly refuse to waive jurisdiction over a criminal proceeding to the juvenile court where the district court complies with the provisions of statute and makes a statement of its findings which provides sufficient specificity to permit meaningful review by this court. *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988).

In *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), this court addressed the issue of the findings that must accompany a trial court's decision on a motion to transfer to juvenile court. In *Stewart*, the trial court did set forth its reasons for retaining jurisdiction of the case, specifically mentioning five of the factors set forth in Neb. Rev. Stat. § 43-202.01 (Reissue 1978) (the predecessor of § 43-276). The defendant contended that the trial court abused its discretion in not considering all the criteria set out in the statute. This court found the defendant's argument to be without merit.

The court noted that in *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966), the Supreme Court, in reviewing a District of Columbia statute which permitted juvenile courts to waive jurisdiction over minors to adult

criminal courts, stated that the juvenile court must accompany its waiver order with the statement of reasons or considerations therefor and that such a statement "must set forth the basis for the order with sufficient specificity to permit meaningful review." 383 U.S. at 561. According to this court:

> The written findings of the trial court in regard to waiver of jurisdiction to the juvenile court refer to five of the eight considerations listed in section 43-202.01, R.S. Supp., 1974. That section requires the *consideration* of the enumerated items, but nowhere does the statute require that the court refer to all eight considerations in its findings. Section 43-202.02, R.S. Supp., 1974, only requires that the court "set forth findings for the reason for its decision." The defendant contends that the trial court did not consider all the items listed in section 43-202.01, R.S. Supp., 1974, because its written order does not refer to all those items.
>
> While it would have been preferable for the trial court to refer to all the considerations set forth in section 43-202.01, R.S. Supp., 1974, in its order, the statute in question does not require the court to do so. In this case, the court did make a separate statement of its findings which appears to comply with the statute and which provides sufficient specificity to permit meaningful review by this court. We conclude that the trial court substantially complied with the statutory scheme set forth above, and that it did not abuse its discretion in concluding from the evidence that a "sound basis exists for retaining this case."

(Emphasis in original.) *State v. Stewart, supra* at 508-09, 250 N.W.2d at 857-58.

In the instant case, the trial court made no written findings. Immediately after arguments at the end of the hearing on defendant's motion to remove to juvenile court, the trial court made the following statement:

> Well, the County Attorney has made that rather a tough sounding statement, and it may be that he would be very pleased if I simply turned it over to the County Court, because for all of us it would remove the problem and we

would be done with it here in this County.

The facility at Kearney handles juvenile, and I suspect — I don't know today, but I suspect it is overloaded with aggressive male juveniles. I guess there are girls and boys, but I doubt that it is too realistic that — to believe that they can help a lot. At least my experience in the past hasn't exhibited that to me.

In the event that this young man is convicted, and with the help of the committees and volunteers and people who want to help criminals, he probably would be more affected by a probation program than Kearney would be.

But this young man hasn't been convicted yet and this is the kind of problem that a community should face and a community faces these kinds of problems through a local jury.

The factual matters, and the people of this County have got to decide what the facts are.

So it is the decision of the Court to deny the motion of the defendant.

From an analysis of the trial court's statement it is impossible to conclude that the court even considered the criteria set forth in § 43-276. As such, those "findings" fall short of the specificity required in order to permit a meaningful review by this court. We must therefore conclude that the order denying transfer to the juvenile court is irregular for failure to make the required findings. The "findings" made by the trial court are set aside. See *Prigge v. Johns*, 184 Neb. 103, 165 N.W.2d 559 (1969).

However, we must deal with the State's contention that by tendering a plea of no contest the defendant has failed to preserve the issue as to the waiver of jurisdiction to the juvenile court.

It is true that as a general rule the voluntary entry of a guilty plea or a plea of no contest waives every defense to a charge, whether the defense is procedural, statutory, or constitutional. *State v. Rivers*, 226 Neb. 353, 411 N.W.2d 350 (1987). See, also, *State v. Kitt*, 232 Neb. 237, 440 N.W.2d 234 (1989).

However, this court has also said that when a defendant enters a plea of guilty, he or she thereby waives all defenses,

other than those that are jurisdictional. See, *In re Application of Rice, Rice v. Olson*, 144 Neb. 547, 14 N.W.2d 850 (1944), *rev'd on other grounds* 324 U.S. 786, 65 S. Ct. 989, 89 L. Ed. 1367 (1945); *State, ex rel. Gossett, v. O'Grady*, 137 Neb. 824, 291 N.W. 497 (1940).

Defendant argues that the district court erred when it retained jurisdiction over his case. The essence of defendant's argument is that the district court, although it had jurisdiction over his case, should not have retained its jurisdiction but, rather, should have divested itself of jurisdiction in favor of the juvenile court. Defendant therefore raises a jurisdictional challenge that is not waived by his plea of no contest.

The conclusion that a juvenile defendant can appeal the trial court's denial of a motion to transfer to juvenile court even if the defendant pled guilty or no contest is bolstered by the fact that §§ 29-1816 and 43-261 specify that the trial court's decision on the motion to transfer is not a final order for the purpose of appeal. To preclude an appeal from the decision of the trial court denying the motion to waive jurisdiction to the juvenile court because the juvenile defendant pled guilty or no contest would result in a situation where a juvenile defendant would have to forgo the benefits of plea negotiation and proceed to trial in order to appeal the waiver ruling. Thus, we will not preclude such an appeal.

Because the record before this court does not provide an adequate basis for a meaningful review, the district court is directed to review the record made on the motion to transfer to juvenile court and to set forth its findings in the matter as provided by § 43-261. Such findings shall then be certified to this court for further consideration of the appeal. See, *State v. Jurgens, ante* p. 103, 454 N.W.2d 280 (1990); *Black v. United States,* 355 F.2d 104 (D.C. Cir. 1965).

REMANDED WITH DIRECTIONS.